**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

---

UNIVERSAL TURBINE PARTS, LLC,

            Plaintiff,

   v.

PRATT & WHITNEY CANADA CORP.,
PATTY & WHITNEY CANADA
HOLDINGS CORP., and P&WC TURBO
ENGINES CORP.,

          Defendants.

C.A No. 2:24-cv-02021-MRP

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS AS ALLEGED IN COMPLAINT ................................................... 1

ARGUMENT ...................................................................................................................... 3

I.     A COMPLAINT MUST BE SUPPORTED BY PLAUSIBLE FACTUAL ALLEGATIONS ........................................................................................................... 4

II.    UTP'S INVOCATION OF "*PER SE*" SHOULD BE REJECTED ............................. 5

III.   UTP FAILS TO ALLEGE ANTITRUST STANDING OR ALLEGE HARM TO COMPETITION AS OPPOSED TO HARM TO ITSELF ........................................... 8

IV.   UTP'S FORECLOSURE ALLEGATIONS ARE LEGALLY INSUFFICIENT TO SUSTAIN A CLAIM OF ANTICOMPETITIVE CONDUCT .................................. 12

     A.    UTP's Allegations Related To Engine Cores Are Insufficient (Compl. ¶¶ 46-60) ........................................................................................ 12

     B.    The DOF Contracts Are Not Illegal Exclusive Dealing (Compl. ¶¶ 68-92) ........................................................................................................... 14

     C.    UTP Does Not Allege Anticompetitive Bundling (Compl. ¶¶ 93-99) .............. 15

     D.    UTP Fails To Plausibly Allege A Refusal To Deal Claim ................................ 17

     E.    Pratt Is Not Required To Price Its Repair Manuals To UTP's Liking (Compl. ¶¶ 61-67) ...................................................................................... 19

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

**Federal Cases**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)......................................................................................................18

*AT&T Corp. v. JMC Telecom, LLC*,
  470 F.3d 525 (3d Cir. 2006).............................................................................................8

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)......................................................................................................17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................4, 7, 12

*Bob Maxfield, Inc. v. Am. Motors Corp.*,
  637 F.2d 1033 (5th Cir. 1981) .........................................................................................14

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) .........................................................................................10

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993).........................................................................................................9

*Cascade Health Sols. v. PeaceHealth*,
  502 F.3d 895 (9th Cir. 2007) ....................................................................................15, 17

*Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*,
  555 F.3d 1188 (10th Cir. 2009) ......................................................................................17

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
  781 F.3d 264 (6th Cir. 2015) ..........................................................................................17

*Concord Boat v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ........................................................................................16

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ..................................................................................... 12-13

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*,
  129 F.3d 240 (2d Cir.1997).............................................................................................8

*Guerrero v. Bensalem Racing Ass'n, Inc.*,
  25 F. Supp. 3d 573 (E.D. Pa. 2014) ...................................................................5

*Host Int'l, Inc. v. Marketplace, PHL, LLC*,
  32 F.4th 242 (3d Cir. 2022) ................................................................4, 9, 11

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010)................................................................. 6-7

*Insignia Sys., Inc. v. News Corp., Ltd.*,
  No. 04-CV-4213, 2005 WL 2063890 (D. Minn. Aug. 25, 2005) ..................................... 12-13

*Int'l Constr. Prod. LLC v. Caterpillar Inc.*,
  No. 15-108-RGA, 2016 WL 264909 (D. Del. Jan. 21, 2016).................................................15

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
  551 U.S. 877 (2007)................................................................................5

*LePage's. Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
  821 F.3d 394 (3d Cir. 2016)................................................................. 16-17

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) (en banc)......................................................16

*New York v. Facebook, Inc.*,
  549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66
  F.4th 288 (D.C. Cir. 2023)......................................................................19

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998)........................................................................ 5-6

*Olympia Equipment Leasing Co. v. W. Union Tel. Co.*,
  797 F.2d 370 (7th Cir. 1986) ...............................................................18

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
  939 F. Supp. 2d 1002 (N.D. Cal. 2013) ..............................................7, 10

*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009)............................................................................19

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002)................................................................6

*Philadelphia Taxi Ass'n v. Uber Techs., Inc.*,
   886 F.3d 332 (3d Cir. 2018)..................................................................................8-9

*PSKS, Inc. v. Leegin Creative Leather Prods.*,
   615 F.3d 412 (5th Cir. 2010) ....................................................................................6

*Radio Music License Comm., Inc. v. SESAC, Inc.*,
   29 F. Supp. 3d 487 (E.D. Pa. 2014) ..........................................................................7

*Royal Drug Co. v. Grp. Life and Health Ins. Co.*,
   737 F.2d 1433 (5th Cir.1984) ....................................................................................6

*SEI Glob. Servs. Inc. v. SS&C Advent*,
   496 F. Supp. 3d 883 (E.D. Pa. 2020) ....................................................................9-11

*Simon & Simon, PC v. Align Tech., Inc.*,
   No. 19-506, 2020 WL 1975139 (D. Del. Apr. 24, 2020)..........................................18

*Spectators' Commc'n. v. Colonial Country Club*,
   253 F.3d 215 (5th Cir. 2001) ....................................................................................6

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961)..................................................................................................14

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2005)........................................................................................................5

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919)..................................................................................................17

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*,
   89 F.4th 430 (3d Cir. 2023) ......................................................................................8

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)......................................................................................16

**Federal Statutes**

Sherman Act....................................................................................................6, 8, 17

## INTRODUCTION

Plaintiff Universal Turbine Parts, LLC ("UTP") is a private-equity owned middleman that is frustrated with its failures in the marketplace. Rather than compete, UTP resorts to the courts, hoping for an order that would force Pratt[1] to compete less vigorously and for a damages award (or at least settlement) that would make up for its allegedly declining revenue. This would perhaps help UTP and its private equity owner, but it would harm consumers—engine owners and aircraft operators.

The antitrust laws protect competition and consumers, not individual competitors or companies that make poor investment choices. UTP's scattershot complaint does not state a plausible antitrust claim and should be dismissed in its entirety.

## STATEMENT OF FACTS AS ALLEGED IN THE COMPLAINT[2]

Pratt is the original equipment manufacturer of two turboprop engine models, PT6 and PW100, as well as a supplier of parts for those engines. (Compl. ¶¶ 25-26.) Over the years, Pratt has manufactured approximately 64,000 PT6 and 8,000 PW100 engines. (*Id.* ¶ 25.)

UTP is in the business of buying and selling used parts for the PT6 and PW100 engines, which are sourced from engines that have been taken out of service for teardown. (*Id.* ¶¶ 3, 5.) Maintenance, Repair & Overhaul Facilities ("MROs"), including Designated Overhaul Facilities ("DOFs") under contract with Pratt, perform various types of aftermarket work, one of which is

---

[1] UTP brings this action against three purported entities without distinction among them. For purposes of this motion only and otherwise reserving all rights, movant refers to the entities as "Pratt." In fact, putative Defendants Pratt & Whitney Canada Holdings Corp. and P&WC Turbo Engines Corp. no longer exist, having been amalgamated into Defendant Pratt & Whitney Canada Corp. and RTCL Corp., respectively.

[2] For purposes of this motion only, Pratt's Statement of Facts assumes the factual allegations in the Complaint are true, but Pratt reserves the right to contest the validity of these alleged facts.

disassembling engines and inspecting used parts to ensure that they qualify as safe for use under Federal Aviation Administration ("FAA") standards.  (*Id.* ¶¶ 4-7.)

As one of many independent dealers in used engines parts, UTP moves material back and forth between the MROs or sells used parts that have been disassembled from engines and inspected by others.  (*Id.*; *see also id.* ¶¶ 33-34, 48.)  UTP purchases these engines and parts from third parties such as other used parts brokers, from MROs, and directly from engine operators. (*Id.* ¶¶ 5, 25, 35.)  UTP either resells those parts or "assembles the parts in its own engines."  (*Id.* ¶¶ 4-5.)  UTP also alleges that it sometimes purchases used engines that are in need of overhaul or replacement (so-called "engine cores") and sends them to a third party, which disassembles the engine core, "bags and tags" reusable parts, and returns such reusable parts to UTP.  (*Id.* ¶ 5.)

Since used parts necessarily come from used engines, a substantial portion of UTP's complaint is dedicated to complaining about how Pratt competes too effectively by acquiring "too many" of the available used PT6 and PW100 engines, making it hard for UTP to obtain engines to send to an MRO or other third party to strip them down for parts.  (Compl. ¶¶ 46-56.) UTP alleges that Pratt does this through popular customer programs, which incentivize aircraft operators who need engine overhauls to trade the used engines for new or already-overhauled engines and, thus, allow these operators to continue flying without interruption.  (*Id.* ¶¶ 53-56.) UTP also complains that Pratt pays too much for available used engines.  (*Id.* ¶ 7c.)  UTP apparently does not like this form of price competition for the acquisition of the engines that UTP wants to buy.  But the higher prices benefit aircraft operators and other engine owners.

UTP also alleges that Pratt has entered into exclusive or semi-exclusive arrangements with two DOFs, StandardAero and Covington Aircraft.  DOFs are critical Pratt partners that "provide 'brand-name' maintenance, repair and overhaul services on Pratt engines."  (Compl. ¶

2

7a.)  In other words, Pratt has set up a network of Pratt-endorsed and overseen "brand-name" MRO shops to better serve consumers through contracts with StandardAero and Covington Aircraft.  In return for being Pratt partners and "brand-name" shops, these DOFs allegedly have agreed not to strip engines supplied by used parts resellers, to purchase parts for engines from anyone other than Pratt, or to sell parts that are harvested from Pratt-supplied engines to anyone other than Pratt.  (Compl. ¶¶ 7a, 26.)  UTP characterizes these agreements as "coercive" and as having been "imposed" on the DOFs.  (Compl. ¶¶ 47, 90.)

UTP makes other allegations regarding Pratt, including that, with the creation of the DOF network, Pratt has (not surprisingly) stopped using parts brokers but chooses to do business with its partners - the DOFs.  (Compl. ¶ 7d.)  UTP also vaguely alleges that Pratt sometimes sells needed parts for engine overhauls in bundles, offering consumers attractive prices.  (Compl. ¶ 8d.)  UTP asserts that these offerings are "anticompetitive" (Compl. ¶¶ 93-94), even though, according to UTP, they lead to customers receiving new parts in their engine overhaul for a lower cost than they would have otherwise received for used parts.

Ultimately, UTP laments the fact that Pratt, the manufacturer, has created more efficient ways for its PT6 and PW100 engines to be repaired and replaced.  While this may be bad news for middleman UTP, it is good news for aircraft operators—which is to say good news for consumers—and provides no basis for an antitrust case.

## ARGUMENT

Underlying each of UTP's claims is the assertion that Pratt has competed too aggressively in the aftermarkets for used airplane engines and parts, including by actively seeking engines for spare parts harvesting, developing a captive network of MROs called DOFs, offering customers attractive parts packages, and charging too much for certain of its service manuals.  UTP seeks to twist this competitive behavior into multiple antitrust violations.

3

Yet, all of UTP's claims[3] suffer from a common fatal deficiency—there are no plausible factual allegations supporting how Pratt's alleged conduct harmed competition, as opposed to perhaps working to the detriment of UTP, a frustrated middleman. There are likewise no plausible allegations of substantial foreclosure. Without such allegations, UTP's claims may not go forward as a matter of law.

## I.    A COMPLAINT MUST BE SUPPORTED BY PLAUSIBLE FACTUAL ALLEGATIONS

A complaint that does not plead enough facts, as distinct from mere legal conclusions, to show that the claim is "plausible on its face" must be dismissed. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59, 570 (2007). As the Third Circuit recently emphasized in upholding a dismissal of an antitrust case, a district court is "not compelled to accept 'unsupported conclusions and unwarranted inferences.'" *Host Int'l, Inc. v. Marketplace, PHL, LLC*, 32 F.4th 242, 248 (3d Cir. 2022) (internal quotation marks omitted). Rather, a court draws on "'judicial experience and common sense,' rather than follow an attenuated chain of assumptions." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A court likewise "need not 'accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Papason v. Allain*, 478 U.S. 265, 286 (1986)).

As the Supreme Court emphasized in *Twombly*, ferreting out cases that do not state a claim is particularly important in antitrust cases, where the costs of discovery are often excessive. *See* 550 U.S. at 546 ("It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust

---

[3] UTP asserts claims for monopolization or attempted monopolization of what it identifies as four antitrust "markets"—the so-called markets for PT6 engines, PT6 parts, PW100 engines, and PW100 parts—as well as for illegal agreements in restraint of trade and exclusive dealing. UTP does not differentiate among the various alleged conduct but rather purports to "repeat[] and reallege[]" that conduct as to each claim "as if fully set forth herein." (*See* Compl. ¶¶ 146, 156, 165, 173.)

discovery can be expensive," "with the right to do so representing an *in terrorem* increment of the settlement value."). As demonstrated below, there is no need to proceed to expensive and time-consuming discovery in this case to dispose of UTP's claims.

## II.    UTP'S INVOCATION OF "*PER SE*" SHOULD BE REJECTED

UTP incorrectly asserts that Pratt's agreements with its brand name MRO shops constitute a "*per se*" violation of the antitrust laws. (Compl. ¶ 10.) The *per se* rule—which in rare cases relieves a plaintiff from establishing that a challenged agreement harmed competition in the particular market—applies only to a very narrow set of agreements, such as "horizontal agreements among [horizontal] competitors to fix prices or to divide markets" "that would always or almost always tend to restrict competition and decrease output." *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citations omitted); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2005) (holding that *per se* analysis is limited to agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality."). In all other cases, the default rule of reason analysis—where the plaintiff must establish that the anticompetitive effects of an agreement outweigh the procompetitive effects— is employed. *See, e.g.*, *Dagher*, 547 U.S. at 5 ("this Court presumptively applies rule of reason analysis"); *Guerrero v. Bensalem Racing Ass'n, Inc.*, 25 F. Supp. 3d 573, 588 (E.D. Pa. 2014) ("Most alleged restraints are analyzed under the 'rule of reason' standard."). Because they typically have procompetitive benefits, vertical agreements, like those at issue in this case, are not subject to *per se* liability. *See, e.g.*, *Leegin*, 551 U.S. at 882 (overruling application of *per se* rule to vertical price restraints); *NYNEX Corp.*, 525 U.S. at 136-37 (holding the *per se* rule is inapplicable to "a vertical agreement and a vertical restraint").

UTP attempts to turn vertical agreements between Pratt and its network of brand name overhaul facilities into a *per se* violation by alleging a *per se* illegal boycott. But a group boycott

claim requires a horizontal agreement—*i.e.*, an agreement between direct competitors. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136-37 (1998) (holding that *per se* rule applies only to boycotts involving horizontal competitors); *see also Spectators' Commc'n. v. Colonial Country Club*, 253 F.3d 215, 223 (5th Cir. 2001) ("one rule is clear: only horizontal boycotts can be *per se* violations of the Sherman Act").  UTP has not alleged any meetings among the DOFs, let alone direct communications among the DOFs, in which they hatched such a horizontal agreement.

Unable to allege that the DOFs directly agreed with one another, UTP attempts to plead a "hub and spoke" conspiracy.  But such a conspiracy still requires plausible allegations that the DOFs agreed with one another.  Specifically, it requires not only agreements between a "hub" (a central organizer) and "spokes" (competing market participants), but a "rim"— connecting agreements among the "spokes" (or horizontal competitors).  *See, e.g., Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (dismissing complaint that "lacks any allegation of an agreement among the [horizontal competitors]"); *see also PSKS, Inc. v. Leegin Creative Leather Prods.*, 615 F.3d 412, 420 (5th Cir. 2010) ("In the absence of an assertion that retailers agreed . . . among themselves, there is no wheel and therefore no hub-and-spoke conspiracy."); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110-11 (2d Cir. 2002) (affirming dismissal for "fail[ure] to adduce any evidence of a horizontal agreement").  There is no such factual allegation here.

That the DOFs each entered into an agreement with Pratt to be an authorized Pratt facility does not lead to a plausible inference of conspiracy among the DOFs.  *See, e.g., Royal Drug Co. v. Grp. Life and Health Ins. Co.*, 737 F.2d 1433, 1437 (5th Cir.1984) (rejecting argument that "uniform contracts entered into separately between competing sellers and a 'powerful buyer'

nevertheless constitute an illegal horizontal combination").  Far from entering into a horizontal agreement with one another, UTP alleges that Pratt "imposed" the agreements in question on the DOFs, including through "pressure tactics."  (Compl. ¶ 90.)  UTP realizes it cannot properly allege a horizontal conspiracy, so it makes the conclusory allegation "[upon] information and belief" that "the DOFs were aware that the other DOF's, and Pratt's own [MRO] Facilities, imposed these restrictions …, and agreed amongst one another to impose such restrictions at Pratt's behest …."  (*Id.* ¶ 44.)

This is precisely the sort of conclusory allegation of "conspiracy" that *Twombly* and a legion of cases since have rejected.  *See Twombly*, 550 U.S. at 557 ("[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."); *Howard Hess Dental Lab'ys Inc.*, 602 F.3d at 255 ("[T]o survive dismissal it does not suffice to simply say that the defendants had knowledge… that the Dealers were aware of each other's involvement in the conspiracy"); *Radio Music License Comm., Inc. v. SESAC, Inc.*, 29 F. Supp. 3d 487, 499 (E.D. Pa. 2014) (dismissing Section 1 claims because "plaintiff fail[ed] to plead, in more than conclusory legal terms, the existence of a hub-and-spoke conspiracy."); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, at 1007-10 (N.D. Cal. 2013) (dismissing plaintiff's *per se* group boycott claims based on hub-and-spoke theory for failure to plausibly plead conspiracy as opposed to two suppliers agreeing to exclusively distribute with a powerful retailer because it was in each supplier's best economic interest to do so).  The absence of any factual allegations of an actual agreement among the DOF "spokes" is fatal to UTP's *per se* claim.

UTP tries to sidestep this fatal deficiency in its assertion of "*per se*" liability by asserting that Pratt and the DOFs compete with each other to a certain extent.  But at most, the Complaint describes a dual distribution arrangement with both vertical and horizontal elements.  (*See e.g.*, Compl. ¶¶ 26, 35.)  As the Third Circuit has emphasized, such "hybrid" restraints are analyzed under the rule of reason.  *See Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 441 (3d Cir. 2023) (concluding "rule of reason as the proper mode of analysis" for alleged schemes falling between "purely horizontal or vertical arrangement[s]").  Where, as alleged here, the relationship is, at a minimum, "primarily" vertical, *per se* does not apply.  *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006) (affirming dismissal of *per se* claim because "vertical restraints are generally not *per se* violations of the Sherman Act even where a distributor and a manufacturer also compete at the distribution level, *i.e.*, have some form of horizontal relationship"); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*, 129 F.3d 240, 243–44 (2d Cir.1997) (marshaling authority from the Sixth, Seventh and Tenth Circuits, as well as guidelines from the Department of Justice, in concluding that such restraints are not *per se* violations of the Sherman Act).  Here, the Complaint makes clear that Pratt authorizes the DOFs to provide "'brand-name' maintenance, repair, and overhaul services on Pratt engines"—a vertical service for Pratt engines to the benefit of Pratt customers.  (Compl. ¶ 7a.)

Because the Complaint does not plausibly allege a horizontal agreement, either standalone or as part of a hub-and-spoke conspiracy, it does not state a *per se* claim under the antitrust laws.

## III.    UTP FAILS TO ALLEGE ANTITRUST STANDING OR ALLEGE HARM TO COMPETITION AS OPPOSED TO HARM TO ITSELF

Outside of the narrow context of *per* se claims, plausible allegations of harm to competition are critical.  *See, e.g., Philadelphia Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332,

338 (3d Cir. 2018) ("[W]e will find a violation of antitrust laws only when" "the challenged conduct has an effect on 'prices, quantity or quality of goods or services'" and "that effect harms the market, and thereby harms the consumer.").  Factual allegations supporting harm to competition are required both to establish that an antitrust violation occurred and to establish the particular plaintiff has standing.  *Id.*  "Not every business tort or breach of contract that has an adverse impact on a competitor can form the basis of an antitrust claim."  *SEI Glob. Servs. Inc. v. SS&C Advent*, 496 F. Supp. 3d 883, 901 (E.D. Pa. 2020).

As a component of antitrust standing, UTP must allege antitrust injury, which is "'injury of the type for which the antitrust laws were intended to provide redress.'"  *Host Int'l, Inc.*, 32 F.4th at 249 (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993)).  Allegations of harm to competition, and not just business harm to an individual competitor, are essential to UTP's claims.  *Host Int'l Inc.*, 32 F.4th at 250 (dismissing antitrust case on motion to dismiss because only harm plausibly alleged was to competitor and "injury to competitors, rather than to competition, is beyond the law's sphere").  This requires that the "'challenged conduct affected the prices, quantity or quality of goods or services, not just [the UTP's] own welfare.'"  *Id.* (quoting *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)).  Without such allegations, there is no antitrust injury and the antitrust claims must be dismissed.  *See also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224-225 (1993) ("It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors'…  Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws."); *SEI*, 496 F. Supp. 3d at 899–900 (dismissing antitrust claims for failure to actually allege harm to competition), *aff'd*, No. 20-3386, 2022 WL 2356730 (3d Cir. June 30, 2022).

UTP devotes several pages of its Complaint to alleged harm (*see* Compl. ¶¶ 122-139), but most of UTP's allegations relate to harm to itself (*see id.* ¶¶ 123-129), which is insufficient. *See, e.g.*, *SEI*, No. 20-3386, 2022 WL 2356730, at *3 (upholding dismissal of antitrust claims where non-conclusory allegations of harm related to the plaintiff, not the market). UTP also attempts to suggest that other competitors have suffered the same alleged harm that UTP has. (*See* Compl. ¶¶ 130-36.) UTP does not name these independent competitors or say how many independent competitors there are and which if any have suffered, other than stating that "some *potentially* have[] exited the space." (Compl. ¶ 130) (emphasis added.) But, in addition to being wholly conclusory speculation, none of these allegations plausibly suggest harm to consumers, which is the critical inquiry. And, in any event, simply speculating that other competitors are experiencing the same difficulty does not state a claim. *See, e.g.*, *SEI Glob. Servs., Inc.*, No. 20-3386, 2022 WL 2356730 at *3 (rejecting speculative allegations of harm to other competitors as basis to deny motion to dismiss).

The three paragraphs that attempt to address actual harm to competition (as opposed to harm to UTP or speculative harm to other competitors) simply recite conclusory phrases without any factual support. (*See* Compl. ¶¶ 137-139.) To the extent UTP relies on the Complaint's generalized assertions of increased prices and reduced consumer choice, both effects are "consistent with a free, competitive market" and thus alone cannot be plausible indications of harm to competition. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) ("Second, allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition. Both effects are fully consistent with a free, competitive market."); *Orchard Supply*, 939 F. Supp. 2d at 1011 (dismissing group boycott claim because "where, as here, the only alleged injury to competition

is increased prices and reduced consumer choice, dismissal is proper.") (citing *Brantley*, 675 F.3d at 1202). In any event, despite UTP's presence in the market and the fact that it alleges conduct going back the better part of a decade, it is unable to point to a *single actual* instance where any of these alleged harms that it speculates *actually* occurred. For example, it points to no prices for engines or parts that were actually raised to anyone or to any operator that suffered from diminished service. As the Third Circuit recently observed, "[s]ailing a straight course through the murky waters of antitrust injury challenges courts to avoid the siren songs of illusory harm." *Host Int'l, Inc.*, 32 F.4th at 252. But this is precisely the siren song that UTP seeks to lure the Court into following. *See also SEI Glob. Servs., Inc.*, No. 20-3386, 2022 WL 2356730 at *3 (rejecting such allegations as insufficient to state a claim of harm to competition).

UTP's failure to identify a single actual example of harm to competition is not surprising. For one, UTP alleges that the MRO shops, including the DOFs, can and do "source their own Used Serviceable Material" without middlemen suppliers like UTP. (Compl. ¶ 33.) In other words, while UTP alleges that DOFs can no longer source the same amount of used parts from UTP and other brokers, they plead contradictorily that the DOFs remain free to self-supply used parts without a middleman. UTP therefore does not and cannot plead that DOFs lack adequate supply of USM or have charged higher prices to consumers because of policies that allegedly make it harder on middleman UTP. UTP likewise cannot use the antitrust laws to force Pratt to sell parts or engines to it; the antitrust laws do "not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Trinko*, 540 U.S. at 408. UTP must do more than assert theoretical possibilities; it must plausibly allege actual facts showing competitive harm. UTP has failed to do this, and its antitrust claims accordingly should be dismissed.

IV.    **UTP'S FORECLOSURE ALLEGATIONS ARE LEGALLY INSUFFICIENT TO SUSTAIN A CLAIM OF ANTICOMPETITIVE CONDUCT**

While UTP's failure to plausibly plead harm to competition (as opposed to itself) alone is dispositive, UTP's critical allegations of "foreclosure" likewise fail.  The hallmark of an exclusive dealing claim is substantial foreclosure of the market.  While the Complaint uses the words "foreclose" and "foreclosure," it provides no *factual* allegations from which substantial foreclosure could be inferred.  As the Supreme Court and others have made clear, such "a formulaic recitation of the elements of a cause of action" does not state a claim.  *Twombly*, 550 U.S. at 555; *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 209 n.20 (4th Cir. 2002) (allegations of exclusive agreements with the "largest PC makers" insufficient to allege substantial foreclosure); *Insignia Sys., Inc. v. News Corp., Ltd.*, No. 04-CV-4213, 2005 WL 2063890, at *3 (D. Minn. Aug. 25, 2005) (dismissing claims under Rule 12(b)(6) for lack of foreclosure "absent some indication of the percentage of the … markets that the 35,000 retail outlets allegedly under exclusive contract constitute").

UTP identifies several types of alleged "foreclosure," but none are adequately pled.

A.    **UTP's Allegations Related To Engine Cores Are Insufficient (Compl. ¶¶ 46-60)**

UTP alleges that Pratt "chok[es] off the lifeblood" of competitors, by restricting their access to used engines they need to create Used Serviceable Material ("USM") through various engine exchange programs and contractual restrictions.  (Compl. ¶ 46.)  But UTP never pleads the percentage of the used engine market that Pratt supposedly forecloses through these programs, much less that Pratt's programs have resulted in substantial foreclosure.

Quite the contrary, UTP alleges that there are used engines available to other market participants that are not gobbled up by Pratt.  For example, UTP alleges that other "brokers" have been able to buy used engines and that UTP has even attempted to secretly buy engines

from them.[4]  (Compl. ¶ 60.)  Elsewhere, UTP alleges DOFs and independent MROs are able to purchase engine cores, from which they can self-supply USM.  (Compl. ¶¶ 33, 36, 48.) More fundamentally, UTP alleges that Pratt has sold more than 64,000 PT6 engines and 8,000 PW100 engines (Compl. ¶ 25) and that the owners of these engines can and do sell them to buyers other than Pratt, including UTP itself.  (Compl. ¶ 101.)  Notably, Plaintiffs did not plead that PT6 and PW100 engines are not readily available for purchase via the internet.[5]

UTP's conclusory allegation that it "is now able to acquire approximately two-thirds fewer engine cores today versus prior to the implementation of Pratt's anticompetitive practices," (Compl. ¶ 123), does not plausibly allege substantial foreclosure in light of the allegations that other market participants continue to purchase used engines despite the challenged Pratt programs – and, in any event, it does not allege the percentage of the available market that has been allegedly foreclosed by Pratt.  UTP does not and cannot allege what percentage of the used engines for sale are purchased by Pratt through the challenged programs as opposed to by other market competitors, such as other brokers, independent MROs, and DOFs, who simply beat UTP to the punch.  UTP's failure to adequately plead substantial foreclosure dooms its claims based the unavailability of used engines.  *See Dickson*, 309 F.3d at 209 n.20; *Insignia Sys., Inc.*, No. 04-CV-4213, 2005 WL 2063890, at *3.

---

[4] UTP's allegation that "Pratt would retaliate against any broker Pratt discovered to have sold engines to independent Used Serviceable Material suppliers" is speculative and lacking in any detail, and therefore should be disregarded. (Compl. ¶ 60.)

[5] Nor could UTP credibly allege otherwise in an amended pleading.  Indeed, even a cursory Google search confirms that PT6 and PW100 engines are readily available for purchase via the internet, confirming a robust market for used engines sales that has not been foreclosed by Pratt's challenged programs.

**B.    The DOF Contracts Are Not Illegal Exclusive Dealing (Compl. ¶¶ 68-92)**

UTP likewise misses the mark with allegations about Pratt's relationships with the DOFs.

Putting aside the risible "*per se* group boycott" theory discussed in Section II, UTP's complaint

in essence is that Pratt has exclusive arrangements with the two DOFs.  But exclusive

arrangements are generally legal under the antitrust laws.  *See, e.g., Bob Maxfield, Inc. v. Am.

Motors Corp.*, 637 F.2d 1033, 1036 (5th Cir. 1981) ("The mere existence of an exclusive dealing

clause in a contract does not establish an antitrust violation.").  Only in limited circumstances

where a significant portion of the market is bound up in exclusive deals for a significant period

of time are such contracts even potentially suspect from an antitrust perspective.  *Tampa Elec.

Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 335 (1961).

Here, again, UTP fails to provide any basis to find substantial foreclosure.  To the

contrary, UTP affirmatively alleges that it can do what the DOFs do in terms of engine teardowns

at least "in some cases" and so can independent MROs "in other cases."  (Compl. ¶ 37.)

Nowhere does UTP allege that Pratt, either alone or in combination with the DOFs, controls a

high share of teardown or "bag and tag" services.  UTP obscures this omission by alleging that

Pratt and the DOFs have high shares of a different type of service altogether—"maintenance,

repair, and overhaul services."  (Compl. ¶ 76.)  UTP does not assert that these are the same thing

as engine teardowns or "bag and tag" services, and, as their other allegations establish, they are

not.  For example, UTP asserts that in addition to being able to do teardowns itself, "some of its

competitors" (*i.e.*, other used parts brokers, not MROs) "have business units that [can] perform

'bag and tag.'"  (Compl. ¶ 76a.)

In sum, UTP both fails to identify the percentage of the available market for used parts

from which it is allegedly foreclosed, and it acknowledges multiple alternative means of

accessing engine teardown services to get those parts.  Accordingly, UTP fails to plead a *prima*

*facie* case of exclusive dealing. *See e.g., Int'l Constr. Prod. LLC v. Caterpillar Inc.*, No. 15-108-RGA, 2016 WL 264909, at *7 (D. Del. Jan. 21, 2016) ("Since ICP has failed to adequately plead substantial foreclosure and a lack of alternative channels of distribution, its exclusive dealing claim cannot be sustained.").

### C.    UTP Does Not Allege Anticompetitive Bundling (Compl. ¶¶ 93-99)

Another of UTP's unfounded allegations is that Pratt illegally "bundles" parts. Here, again, UTP fails to allege facts from which it could be inferred that the bundle—which is to say the lower price Pratt offers to customers who purchase more parts—harms competition. And the nature of the bundle that UTP posits—where Pratt provides new parts at a discount that a customer finds attractive relative to a mix of undiscounted new and used parts—can hardly be called anticompetitive. To the contrary, "[b]undled discounts are pervasive, and examples abound. … Bundled discounts generally benefit buyers because the discounts allow the buyer to get more for less." *Cascade Health Sols. v. PeaceHealth*, 502 F.3d 895, 905-06 (9th Cir. 2007). By offering new parts at attractive prices relative to a mix of new and used parts, Pratt facilitates engines being repaired with new parts rather than used. UTP itself admits such new parts "have longer remaining hours or cycle times compared to used serviceable parts." (Compl. ¶ 27.) Limiting Pratt from selling new parts at prices that are attractive relative to used parts would stand the antitrust laws on their head because it would result in lower quality or higher price repairs. This would be the opposite of "price cutting," which "is a practice the antitrust laws aim to promote." *PeaceHealth*, 502 F.3d at 906.

UTP does not allege that Pratt's alleged bundles amount to exclusive dealing or impermissible tying of two products in different markets—two situations in which a bundle *might* be anticompetitive if it foreclosed enough competition from the relevant market. To the contrary, UTP points to one-off bundles of products that UTP alleges are in the same antitrust

product market for particular repair needs of a particular engine. (*See* Compl. ¶¶ 95-96, 104-105.) Cases like *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) and *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc), both of which addressed bundling practices embedded in long-term contracts, are accordingly inapposite. *See ZF Meritor*, 696 F.3d at 269-70 (discussing difference between claims involving "pricing practices" such as are at issue here, and "*de facto* exclusive dealing contracts"). The fact that the items in the alleged bundles are, according to UTP's allegations, in the same product market is also fatal to any bundling claim under the reasoning of *ZF Meritor* or *LePage's*. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 405–06 (3d Cir. 2016) ("In *ZF Meritor*, we limited the reasoning in *LePage's* 'to cases in which a single-product producer is excluded through a bundled rebate program offered by a producer of multiple products, which conditions the rebates on purchases across multiple different product lines.' Significantly, Eisai does not claim that Sanofi conditioned discounts on purchases across various product lines, but on different types of demand for the same product. Such conduct does not present the same antitrust concerns as in LePage's, and we are aware of no court that has credited this novel theory."); *see also Concord Boat v. Brunswick Corp.*, 207 F.3d 1039, 1062 (8th Cir. 2000) ("[B]undling or tying ... 'cannot exist unless two separate product markets have been linked.'") (internal citations omitted).

In any event, UTP does not allege that the bundled discounts somehow deprived "customers of the ability to make a meaningful choice"—the concern of antitrust law. *See, e.g.*, *Eisai*, 821 F.3d at 404. While UTP attempts to allege in wholly conclusory terms that Pratt offers certain of its bundled products below its own costs,[6] nowhere does UTP allege that Pratt

---

[6] UTP states that "[s]uch bundling has the effect of Pratt offering certain of its bundled products below its owns costs" (Compl. ¶ 98) but provides no details on what products or in what

foreclosed UTP's ability to sell parts to operators or maintenance shops in a relevant market—let alone that Pratt foreclosed a substantial share of the available avenues through which UTP can sell its parts.[7]  The Complaint is utterly devoid of any allegation regarding how many customers have availed themselves of the "capped cost" program or even that UTP is unable to sell parts to operators (let alone what percentage of them) because of this program.  *Cf. Eisai*, 821 F.3d at 407 ("Without evidence of substantial foreclosure or anticompetitive effects, Eisai has failed to demonstrate that the probable effect of Sanofi's conduct was to substantially lessen competition in the relevant market, rather than to merely disadvantage rivals.").

> **D.      UTP Fails to Plausibly Allege a Refusal to Deal Claim**

UTP further alleges that Pratt now refuses to sell UTP used engines despite having done so in the past.  (Compl. ¶¶ 57-60.)  Even if this is true, antitrust law does not generally restrict a firm's right to choose whom it will deal with.  *See, e.g., United States v. Colgate & Co.*, 250 U.S. 300 (1919).  Firms may change their minds.  *See Christy Sports, LLC v. Deer Valley Resort Co.,*

---

circumstances that is the case or on what basis it asserts that Pratt sells any parts at below *Pratt's* costs.  Indeed, UTP fails to provide even a single example where this has actually occurred, much less occurred with such regularity as to have a potential to adversely impact competition, as opposed to competitors.

[7] In other Circuits, the *only* situation where bundled discounts can violate the antitrust laws is where the seller prices below its cost.  *PeaceHealth*, 502 F.3d at 913-14 (Ninth Circuit: "[W]e hold that the exclusionary conduct element of a claim arising under § 2 of the Sherman Act cannot be satisfied by reference to bundled discounts unless the discounts result in prices that are below an appropriate measure of the defendant's costs."); *accord Collins Inkjet Corp. v. Eastman Kodak Co.,* 781 F.3d 264, 272-74 (6th Cir. 2015) (endorsing *PeaceHealth* and extending below-cost test to tying arrangements "enforced solely through differential pricing"); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("Low prices benefit consumers regardless of how prices are set, and so long as they are above predatory levels, they do not threaten competition.").  While the Third Circuit has (for the moment) declined to opine "when, if ever, the price cost test" applies in a case where the primary mechanism of exclusion is a bundle as opposed to ordinary price discounting, it has made clear that, even in a case of alleged below cost bundling, the Plaintiff must show anticompetitive effects in a relevant market.  *Eisai*, 821 F.3d at 407-409.

*Ltd.*, 555 F.3d 1188, 1198 (10th Cir. 2009) ("The antitrust laws should not be allowed to stifle a business's ability to experiment in how it operates, nor forbid it to change course upon discovering a preferable path."); *Olympia Equipment Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 376 (7th Cir. 1986) ("If a monopolist does extend a helping hand, though not required to do so, and later withdraws it as happened in this case, does he incur antitrust liability? We think not.").

Notwithstanding the fact that multiple courts have rejected the very theory that UTP advances in its complaint, UTP relies on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), which the Supreme Court later clarified involved unusual claims that "are at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. To plead a claim based on a refusal to deal, "the Complaint must contain allegations plausibly suggesting that the defendant's conduct made no economic sense but for its anticompetitive purpose." *Simon & Simon, PC v. Align Tech., Inc.*, No. 19-506, 2020 WL 1975139, at *6 (D. Del. Apr. 24, 2020) (citing *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.)). Here, while the Complaint alleges that Pratt previously sold engines to UTP and speculates that Pratt did so "because it was profitable" (Compl. ¶ 57), UTP at minimum fails to plausibly allege that Pratt changed course solely to prevent UTP from having the supply to compete. In fact, the Complaint itself is far more consistent with the inference that Pratt's internal demand for used engines increased due to the popularity of its engine trade-in programs. (Compl. ¶ 53-56.)

Because UTP has not plausibly alleged that Pratt's refusal to deal made no economic sense "but for" its tendency to eliminate competition, UTP's refusal to deal claim fails. *See Simon & Simon*, No. 19-596, 2020 WL 1975139, at *6 (dismissing refusal to deal claim where plaintiff alleged prior profitable course of dealing but "Complaint itself reveal[ed] alternative,

procompetitive explanation" for refusal); *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 27 (D.D.C. 2021) (dismissing refusal to deal claim and concluding such claim "requires the predatory motivation to be 'the only conceivable rationale or purpose' for otherwise inexplicable profit sacrifice"), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023).

### E.     Pratt is Not Required to Price Its Repair Manuals to UTP's Liking (Compl. ¶¶ 61-67)

UTP's complaint about the price that Pratt charges for repair manuals is similarly deficient.  According to UTP, the FAA requires an MRO to have certain manuals from the original manufacturer of an engine.  There is no allegation that the FAA requires any particular pricing as to the manuals, or that it forbids manufacturers from increasing the prices of manuals over time.  UTP likewise tellingly does *not* allege that Pratt charges different prices for its manuals to different parties and, indeed, suggests that the DOFs pay Pratt for the manuals just like any other MRO.  (Compl. ¶ 66.)  Nor does UTP point to a single MRO (or anyone else needing the manuals) that has been unable to stay in business.  Rather, as in other critical aspects of its complaint, UTP simply make conclusory assertions of what "might" or "could" happen. (*See* Compl. ¶¶ 66-67.)  Such conclusory assertions cannot ground an antitrust claim against dismissal under Rule 12(b)(6).

UTP's complaint here is reminiscent of the rejected claims in *Trinko*.  There, FCC regulations required Verizon to allow rivals to interconnect with its system.  Verizon was accused of making it expensive to interconnect.  The Supreme Court rejected the claim of monopolization, holding that a firm has no duty to deal under the terms and conditions that its competitors find commercially advantageous.  *Trinko*, 540 U.S. at 415–16; *see also Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009) (discussing *Trinko* and applying to internet service provider rival's price-squeeze claim).  The Supreme Court in *Trinko* also flatly

rejected having a court act as a price-setting agency, 540 U.S. at 415, which is precisely what UTP proposes here.  (Compl. ¶¶ 64-65.)[8]

## CONCLUSION

For the foregoing reasons, Pratt respectfully request that the Court dismiss UTP's Complaint in its entirety.

July 23, 2024                                          Respectfully submitted,

                                                      By: */s/ Paul H. Saint-Antoine*
                                                      Paul H. Saint-Antoine, Bar No. 56224
                                                      Antonio M. Pozos, Bar No. 323968
                                                      Bridgette C. Lehman, Bar No. 330003
                                                      FAEGRE DRINKER BIDDLE & REATH LLP
                                                      One Logan Square, Suite 2000
                                                      Philadelphia, PA 19103
                                                      Telephone: (215) 988-2700
                                                      paul.saint-antoine@faegredrinker.com
                                                      antonio.pozos@faegredrinker.com
                                                      bridgette.lehman@faegredrinker.com

                                                      Ryan Shores*
                                                      Steven J. Kaiser*
                                                      CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                                      2112 Pennsylvania Avenue, NW
                                                      Washington, DC 20037
                                                      Telephone: (202) 974-1500
                                                      rshores@cgsh.com
                                                      skaiser@cgsh.com

                                                      Heather Nyong'o*
                                                      CLEARY GOTTLIEB STEEN & HAMILTON LLP
                                                      650 California Street, Suite 2000
                                                      San Francisco, CA 94108
                                                      Telephone: (415) 796-4400
                                                      hnyongo@cgsh.com
                                                      * Admitted *pro hac vice*

---

[8] In *Trinko*, the FCC required interconnections under the 1996 Telecommunications Act.  Here, there is no such regulatory command alleged.  Yet, even acknowledging that Verizon had allegedly violated the regulatory command, the Supreme Court held there was no *antitrust* violation because "forced sharing" is generally not required *by the antitrust laws*.  *See, e.g.*, *Trinko*, 540 U.S. at 408.

Karma M. Guilianelli
*Pro Hac Vice Application Forthcoming*
Joseph W. Doman
*Pro Hac Vice Application Forthcoming*
Bartlit Beck LLP
1801 Wewatta St, Suite 1200
Denver, CO 80202
Tel:  (303) 592-3152
karma.giulianelli@bartlitbeck.com
joe.doman@bartlitbeck.com

Jason L. Peltz
*Pro Hac Vice Application Forthcoming*
Bartlit Beck LLP
54 West Hubbard Street
Chicago, IL 60654
Tel:  (312) 494-4400
jason.peltz@bartlitbeck.com

*Attorneys for Pratt & Whitney Canada Corp.,
including as successor in interest to P&WC Turbo
Engines Co., and for RTCL Corp., as successor in
interest to Pratt & Whitney Canada Holdings Corp.*