```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA

                                   .
Universal Turbine Parts, LLC,      . Docket # 24-cv-2021-MRP
                                   .
     Plaintiff,                    .
                                   . United States Courthouse
     vs.                           . Philadelphia, PA
                                   . April 28, 2025
Pratt & Whitney Canada Corp.,      . 10:33 a.m.
et al.,                            .
                                   .
     Defendants.                   .
.........................................................
```

                TRANSCRIPT OF MOTION TO DISMISS HEARING
                 BEFORE THE HONORABLE MIA R. PEREZ
                  UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For The Plaintiff:     Robert A. Milne, Esq.
                       White & Case LLP
                       1221 Avenue of the Americas
                       New York, NY 10020
                       (212) 819-8924
                       Email: rmilne@whitecase.com

For The Defendant:     Karma M. Giulianelli, Esq.
                       Bartlit Beck Herman Palenchar & Scott LLP
                       1899 Wynkoop St., Suite 800
                       Denver, CO 80202
                       (303) 592-3100
                       Email: karma.giulianelli@bartlit-beck.com


Audio Operator:        Mia Harvey, Courtroom Deputy

Transcribing Firm:     Intellectix Corporation


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

## Index

                                            Pgs.

Oral Arguments For The Defendant:

KARMA M. GIULIANELLI              2 - 29    50 - 53


Oral Arguments For The Plaintiff:

ROBERT A. MILNE                   2, 29 - 50, 53 - 54

```
1         (Whereupon, at 10:33 a.m., the hearing was commenced.)

2         THE COURT:  Argument on this matter, Docket 24-cv-

3   2021.  Counsel, before we get started, please place your names

4   on the record if you are planning on making oral argument today

5   or standing up in an argument.  Please.

6         MS. KARMA GIULIANELLI:  Karma Giulianelli, uh, for

7   Pratt and Whitney, and I suppose I should have let the

8   plaintiff go first, but I was thinking it's our motion, so.

9         THE COURT:  I- I- I think, I'm guessing he uh, was

10  going with the more generous and polite way to go.  Chivalry is

11  not dead.

12        MR. ROBERT MILNE: I'm used to being a defense counsel

13  myself, but, uh, Robert Milne.  M-I-L-N-E is how you spell the

14  last name, on the case, on behalf of the plaintiff, Universal

15  Turbine.

16        THE COURT:  Thank you very much.  Is anyone else

17  making argument today on the record?  Just the two of you?  I

18  just want to make sure I have a lot of lawyers, so.  Okay,

19  instead of going through everyone who's actually here today,

20  why don't we just get started with the oral argument, and I'll

21  take notice of everyone who is here.

22        MS. GIULIANELLI:  Great.  Well, then, I suppose since

23  it's our motion, I will start.  Thank you.  Uh, for- would you

24  prefer me to stand or-

25        THE COURT:  I would.  Thank you.
```

1           MS. GIULIANELLI:  Thank you for inviting us in for

2    oral argument today.  It's important because UTP challenges a

3    blunderbuss of business practices by Pratt in a complicated

4    complaint.  It basically takes everything that Pratt- most of

5    the things that Pratt has done over the course of nearly a

6    decade and labels it an antitrust violation.  And so I ask,

7    Your Honor, to indulge me today to unpack some of this.

8           THE COURT:  Please.

9           MS. GIULIANELLI:  And to start with a little bit of

10   the background of the industry, the players, and how it works.

11   Because going through some of the background about the industry

12   is important to understanding why UTP's complaint fails as a

13   matter of law.  I have to say there are a number of significant

14   allegations in the complaint that are inaccurate.  But as we

15   must, I'm taking the allegations as true for purposes of the

16   motion to dismiss today.

17          Now, we prepared some slides and I think we have

18   handed our slides up.  And I believe UTP also has slides to use

19   today.  Starting with slide two, at issue in this case are two

20   types of engines and their parts: the PT6 and the PW100.

21          Pratt, of course, is the original manufacturer of

22   these engines for the turboprop engine models.  They've both

23   been in production for more than 40 years.  In fact, UTP

24   alleges that there are 64,000 PT6 engines out there, and 8,000

25   PW100 engines have been made.

1          So there are a lot of engines out there and a lot of

2     old engines that can serve as a source for parts, which I'm

3     going to get to more in a bit when I discuss their actual

4     allegations.

5          Now, after a time, engines need repairs and

6     overhauls.  When these engines need repairs and overhauls, if

7     Your Honor can slip- go to slide three, aircraft owners have

8     various options for where to go.  Pratt, as alleged, repairs

9     some of the engines directly, but Pratt can't possibly handle

10    all of the repairs for all the engines that are out there.  So

11    Pratt has certain authorized distributors and repair

12    facilities.

13         These are called for the overhaul services to make

14    sure that the customers have access to repairs when they need

15    them.  These facilities are called Designated Overhaul

16    Facilities, or DOFs, and the DOFs provide the same guaranteed

17    quality that Pratt does.  Owners can also go to independent

18    repair shops, at least for the PT6, as UTP alleges.

19         That's like your corner mechanic that's

20    unaffiliated with the company that manufactures your car.

21    There are many independent repair shops out there for the PT6.

22    Engine repairs require parts, which is what this case, of

23    course, is about.

24         So if Your Honor turns to slide four, and this is

25    where parts come from.  All used parts come from engine cores

1    at one time or another.  Some are harvested right away, and

2    some are- they are to be harvested for later.

3            All used cores, of course, come from planes, and they

4    can be sold, the cores, by the aircraft owners themselves,

5    which are both government and private entities, or via an

6    engine broker intermediate- intermediary.

7            Pratt, as alleged, the DOFs and these independent

8    MROs, as shown in slide 4, they compete for cores.  And of

9    course, Pat- Pratt competes hard for cores.  Antitrust law

10   encourages hard competition, not discourages it.

11           Now, once Pratt, turning to slide 5, uh, the DOFs or

12   the independent MROs get an engine core, they harvest those

13   cores for the parts.  They break down the part- the cores.

14   They inspect the parts to make sure that they're airworthy.

15   And then, in essence, they can repackage them and certify them

16   for resale.  That's called bagging and tagging, and that's

17   what's shown there on slide 5.  It takes work to do this

18   bagging and tagging process.

19           So where does UTP fit in?  To figure out where UTP

20   fits in, it's best to look at paragraph five of their

21   complaint, which I've called out on slide 6, and in fact on

22   slide 7, which is, I think, a better illustration, I just took

23   the allegations of their complaint and broke it down into a

24   picture for how it works.

25           UTP alleges that it buys cores and then it sends the

1   cores to the MROs, who, then, you'll see in the steps there,

2   the circle, disassemble and inspect the cores, that's bagging

3   and tagging.  And then they resell the parts back to UTP, who

4   then resell them back to the same DOFs or MROs that did the

5   work.

6           Now, sometimes they say they also can sell them

7   directly to the aircraft ultimate customer.  The ultimate

8   customer in this market is the aircraft owner.  UTP does not

9   repair or overhaul the engines itself.  It prefers to rely on

10  others to do the work of breaking down the engines and

11  harvesting the parts.

12          Now it alleges that it can, in fact, do its own

13  bagging and tagging of parts for the PT6, but it largely

14  prefairs(sic) repairs, excuse me, prefers to rely on others.

15  In other words, they're not doing any work here.  They're just

16  a go-between looking to exploit market opportunities.  They're

17  a middleman.

18          UTP says that it's being cut out of its middleman

19  position.  In this case, it complains that it can no longer get

20  the DOFs because of alleged Pratt restrictions to do this

21  bagging and tagging work for it.  And it also complains that

22  it's harder to get engine cores.

23          And I want to go through the actual allegations in a

24  minute to show how they fail as a matter of law.  And this

25  complaint must be dismissed.

1          But critically, UTP's complaint does not allege that

2   the ultimate customers, those are the aircraft owners, no

3   longer have any non-Pratt sources for parts, repairs, or

4   overhauls.  When you cut out the middleman, customers still

5   have the same number of places to go to get their engines

6   repaired.  UTP again doesn't do the repairs.  It's a parts

7   intermediary.  This case is about harm to UTP, not to

8   customers.

9          THE COURT:  Can I ask you a quick question?

10         MS. GIULIANELLI:  Sure.

11         THE COURT:  The DOFs.  Approximately how many DOFs

12   are there out there?

13         MS. GIULIANELLI:  Well, there are a variety of DOFs,

14   but in UTP's complaint, it alleges that there are two main DOFs

15   for the US market.

16         THE COURT:  Okay.  And I understand their complaint-

17         MS. GIULIANELLI:  Yes.

18         THE COURT:  -in terms of as Pratt does business with

19   these DOFs.  How many are you doing business?  Is it two or is

20   it more?

21         MS. GIULIANELLI:  There are more DOFs worldwide.  But

22   I think for purposes of the US, there are two main DOFs.

23         THE COURT:  Okay.  So we're in agreement that we're

24   looking at two.  Okay.  And in terms of MRO's, do you have any

25   knowledge?

1          MS. GIULIANELLI:  Uh, for the PT or sorry for the

2   PT6, there are a variety of MROs out there.

3          THE COURT:  Under 20?  Give me a size of the pool

4   we're talking about here.  Ballpark.

5          MS. GIULIANELLI:  Probably around 20 is the

6   confirmation I have just received.

7          THE COURT:  Okay.  Thank you.

8          MS. GIULIANELLI:  Okay.  So, uh, I'm going to go

9   through the basis for dismissal here, and their allegations

10  fail as a matter of law for three overarching reasons that I

11  want to go through with respect to each piece of conduct.

12         First, they fail to plead harm to competition and

13  consumers, and they fail to plead that the independent brokers

14  are foreclosed, and they also fail to plead a per se

15  conspiracy.  Now, before getting to the alleged anti-

16  competitive conduct buckets, I want to talk about the per se

17  claim.

18         UTP alleges that Pratt is somehow in a conspiracy

19  with its DOFs, its authorized distributors.  That's per se

20  illegal.  As Your Honor knows, a per se antitrust violation

21  requires conduct that is so bad, like price fixing, an

22  agreement between horizontal competitors, that a court can

23  treat it as per se without inquiring into the merits or the

24  business justifications for that conduct.  That is not the case

25  here.

1          The agreements between Pratt and the DOFs are

2    vertical agreements, as shown in slide 10.  And in fact, the

3    vertical relationship, the agreements between Pratt and its

4    distributors, is nicely laid out in paragraph 26 of UTP's own

5    complaint.

6          Per se treatment does not apply as a matter of law to

7    a series of vertical agreements between a manufacturer and its

8    authorized distributors, and that's what we have here.  The

9    Supreme Court in the leading case made clear that per se

10   treatment does not apply to vertical agreements, even when the

11   agreement is with distributors to set prices, minimum prices.

12         Even then, it doesn't, because vertical agreements

13   have complex economic analysis and often pro-competitive

14   justifications.  That Pratt and DOF may compete, that the Pratt

15   and its DOFs may compete in some ways, does not change that

16   fact.

17         And we cite in our brief, and I have on slide 12 a

18   couple of cases that stand for the clear proposition that where

19   there is a mixed horizontal and vertical relationship, the rule

20   of reason applies.  That's just standard law.

21         So, the only way that UTP can get to some sort of a

22   per se claim is by trying to allege a hub-and-spoke agreement.

23   And that's where you have a hub, a manufacturer like Pratt, and

24   you have a bunch of horizontal competitors, the spokes, that

25   enter into a conspiracy with one another.  In order to have a

1    hub and spoke group boycott, they must plausibly allege that

2    the DOFs, the horizontal competitors, agreed with one another,

3    and they utterly fail to do that.

4              Now, if Your Honor, I was looking at UTP slides over

5    the weekend.  I'm sure they were looking at ours, too, so

6    they'll refer to ours, too.  If Your Honor looks at UTP's own

7    slides, their slide 16 describes the agreement, and UTP defines

8    the agreement as Pratt requiring the DOFs to stop dealing with

9    UTP.  That is not a group boycott between Pratt and the DOFs,

10   where the DOFs agreed with one another.

11             And UTP cannot cite one case, and that's not going to

12   change with all the discovery in the world.  That says that a

13   series of independent agreements between distributors and a

14   manufacturer is a per se group boycott.  They must plead

15   plausible facts of an agreement between the DOFs.  And they

16   don't.  There's not one email, there's not one communication

17   between the DOFs pled.  In fact, what they have, if Your Honor

18   looks at slide 13, paragraph 14-

19             THE COURT:  The defense slide 13, correct?

20             MS. GIULIANELLI:  Yes.

21             THE COURT:  Okay.  Just want to make sure-

22             MS. GIULIANELLI:  I'm back to mine.

23             THE COURT:  It's okay.

24             MS. GIULIANELLI: I'm sticking to mine for most of the

25   argument.  I like my slides better than theirs.  Um, and this

1    is a call out of paragraph 44 of their complaint.  And what

2    they have is just a purely conclusory allegation that, on

3    information and belief, the DOFs were each aware that there

4    were other DOFs.

5             That is just not enough.  That's what the Howard Hess

6    case that we cite in our briefs made clear, where, in that

7    case, they allege that each distributor knew that other

8    distributors had authorized distribution agreements.  The court

9    said that's not enough.  They have zero factual allegations

10   supporting an agreement.

11            Instead, it's worse.  The complaint actually alleges

12   that the DOFs have an independent, unilateral business, a

13   reason to contract with Pratt.

14            Now, what is that?  The DOFs provide brand-name

15   services for Pratt, and Pratt offers them attractive discounts.

16   These allegations show why the DOFs have an independent,

17   unilateral interest, absent some agreement between one another

18   to become Pratt's authorized distributors.

19            And there's one thing that the Twombly case taught us

20   over two decades ago, and that's that a complaint must have

21   plausible allegations of agreement, not just parallel conduct,

22   that they each have a contract with Pratt, that could just as

23   well be independent action in furtherance of their own economic

24   interests.

25            When the allegations fail on the face of the

1   complaint, they must be dismissed at this stage.   UTP, in its

2   briefing in its slides, urges that the court wait for the

3   standard.   But their cases don't support their claim that the

4   standard should be decided later.

5         In their slides, they have the International

6   Construction Products versus Caterpillar case.   In that case,

7   the court found that the complaint did plausibly allege a

8   horizontal conspiracy among horizontal sets of defendants.

9   Here, UTP has not pled that.   They don't plead facts showing

10  it, nothing.   They only plead a series of vertical agreements

11  between Pratt and its distributors.

12        And of course, the other case that they cite is the

13  high-tech employee case.   And in that case, the parties

14  actually agreed with what- to, to defer the ruling on the

15  standard.   And there too, and in that case, there was a purely

16  horizontal agreement between competitors, employers like Apple,

17  Steve Jobs not to hire or poach each other's employees.   That

18  was a horizontal agreement, and the parties agreed to defer the

19  standard.   In this case, their per se claims must be dismissed

20  because they do not plead a plausible horizontal conspiracy.

21        Now, moving to the actual other allegations of

22  conduct in their complaint, I plan to address each piece of

23  alle- alleged conduct and show why UTP does not state a claim.

24  But before doing that, I'd like to cut to the chase.   And I

25  think I alluded to this already.

1            UTP, if we go back to slide 7, that's the middleman

2      slide.  They plead that they rely on DOFs to do the bagging and

3      tagging work for them, and then they sell the parts back to the

4      DOFs.  Well, if you look at our slide 8 and this is the world

5      where UTP disappears, where the middleman disappears.

6            I just took out a couple of their extra steps in

7      there.  Even if all their allegations were true, and UTP, as

8      the middlemen, were squeezed out of the market, they've not

9      alleged that competition and consumers, the aircraft

10     manufacturers who chose to overhaul their engines, have or

11     plausibly will suffer any harm.

12           The consumer aircraft owners have all the same repair

13     facilities.  I guess the 20 or so independent MROs for the PT6

14     and the DOFs and Pratt, the same number that were out there

15     before.  These facilities are the ones that are doing the work.

16     And UTP even alleges that DOFs and the independent MROs self-

17     supply used parts without paying a middleman, UTP.

18           I'd like to pause to note something that I noticed in

19     their slides over the weekend.  In their slides, for instance,

20     slide 5, citing paragraphs 61 through 67.  They write that

21     independent MRO facilities, the ones doing the repairs, are

22     largely being driven out of business, but the allegations that

23     they cite and the allegations in the complaint do not say that.

24     There's no allegation in the complaint that a single MRO has

25     closed, not one as a result of Pratt's conduct.  That's

1    important.

2          And that is very different than the Kodak case that

3    they now rely on so heavily in their slides, where the

4    allegation was that independent service organizations were

5    being cut out of the market because Kodak tied the sale of

6    parts to the provision of repair services to corner the repair

7    market.  That's not what is going on in this case.

8          Now, if you go back to slide 6, which is, I think,

9    paragraph five of their complaint, UTP also alleges that it

10   sometimes sells directly to aircraft owners.  It can still do

11   that.  There's nothing stopping UTP from selling to the

12   ultimate customer here.  They make no allegations that Pratt

13   restricts their ability to sell parts to aircraft owners.

14         As a matter of law, harm to competition requires

15   showing market-wide harm, not just harm to UTP.  The Third

16   Circuit and all the antitrust cases are clear about that.

17         So even if they exit the market, their customers,

18   their owners, still have plenty of ways to get parts from

19   Pratt, from the DOFs, from independent MROs, and even from the

20   ten other independent part brokers, not MROs, but just

21   intermediaries that UTP alleges are out there.  UTP alleges

22   that some other unnamed suppliers have exited on information or

23   belief.

24         That's just conclusory, and it's not enough.  But

25   more importantly, and this is the critical antitrust point, UTP

1  provides no facts showing that these other unnamed brokers

2  might have lost sales because of anything anti-competitive.

3  Losing sales, if they, in fact, are, and you take this

4  conclusory allegation as enough, is perfectly consistent with

5  competition, lowered prices, and a higher quality product.

6       Loss of sales is not anti-competitive harm,

7  especially where, as here on the complaint, UTP alleges that

8  Pratt lowered prices for parts and provided great trade-in

9  values for its engines through its engine exchange programs,

10 which I'm turning to now.

11      And there are no allegations that Pratt or the DOFs

12 are already charging higher prices for used parts, even though

13 they allege that this conduct has been in place for the better

14 part of a decade.

15      I was interested to see their slide, slide 16, where

16 they say they alleged prices for new and used parts have

17 substantially increased.  The only thing I could find in the

18 complaint, and the closest they come to that, is paragraph 37,

19 where they allege in conclusory terms that customers have been

20 deprived of competitive, sustained competitive pricing.

21      They don't allege that the prices have actually

22 increased.  They just allege in a highly conclusory way that

23 they will increase in the future.  But that's not plausible

24 where this conduct has allegedly been in place for the better

25 part of a decade, and especially in light of very specific

1    allegations throughout their complaint that Pratt has actually

2    been offering lower prices.

3          They complain that Pratt is offering lower prices in

4    a capped cost program, and that Pratt is offering lower prices

5    or great trade-in values for customers to get new engines.  And

6    I'm going to show you how that works.  Now that makes any

7    allegation of consumer harm implausible.

8          So, turning to the specific alleged conduct.  As I

9    said, and here I'm going to use their slides a little bit, the

10   complaint has a blunderbuss of allegations.  And so I want to

11   unpack it a little bit and put it into categories.  And in

12   fact, they do that in their slides.

13         I see that they basically divide the allegations into

14   two high-level categories.  They say, slide 5, that they have

15   difficulties buying parts.  I'm going to address that.  And

16   they say, slide 6, that they have difficulties selling parts.

17         So let's start with the category of conduct and all

18   this stuff under difficulties getting parts, slides 4 and 5.

19         One of their biggest gripes is that it's now more

20   difficult to procure engine cores, because remember that's

21   where parts come from.  And we compete for those engine cores.

22   A large part of their complaint is based on that.

23         If we go back to where parts come from, remember,

24   there are tens of thousands of PT6 engines that have been made,

25   and thousands of PW100 engines.  There are many, many ways that

1    UTP can get these engine cores.  They can buy them from the

2    tens of thousands of owner operators, the aircraft

3    manufacturers, directly.  They can buy them from governmental

4    entities or fleet operators.  And they can buy them from

5    independent MROs.

6            Now, UTP actually does allege that it's still able to

7    purchase engine cores, but what it says is that it purchases

8    two-thirds fewer than it did back in 2015, and it attributes

9    that to Pratt's conduct.  Why does UTP say it's able to

10   purchase fewer cores?  Well, if you look at slide 15, this is a

11   callout from their complaint.  This is about Pratt's decision

12   to unilaterally stop selling cores to UTP.

13           They allege in the complaint that Pratt was

14   previously a major source of engine cores for UTP.  Now, how

15   much of the two-thirds drop in engine core purchases were

16   attributed to this unilateral refusal to deal?  They don't say,

17   but it sure looks like a lot based on the allegations in their

18   complaint, paragraph 59, and also paragraph 36.

19           The complaints allegations on their face, though, do

20   not state a plausible claim or an actual actionable claim for a

21   unilateral refusal to deal.  And apparently, that's the

22   majority of UTP failure to get engines as a source of parts.

23           UTP merely alleges that Pratt used to sell engine

24   cores to UTP profitably, and that Pratt has unilaterally

25   decided to stop selling.  That's not enough as a matter of law.

1    Especially where as here, UTP has also made specific

2    allegations that show that it would make perfect economic

3    business sense for Pratt to stop selling cores to middlemen

4    like UTP.

5              I want to go to something else, and I'm going to show

6    why they allege in the complaint, if Your Honor would move to

7    slide 16.  Now, what slide 16 shows is that Pratt gives the

8    customers, the aircraft owners, even more choices.  As alleged

9    in the complaint, while Pratt stopped selling to UTP, it

10   provides options for customers that need overhauls.  There are

11   two additional options for customers.  They complain about

12   these.  One of them is the fleet exchange program here on slide

13   16.

14             Now what is that?  Pratt gives the customers the

15   option to exchange an old engine for a newly overhauled engine

16   from Pratt.  The program is clearly good for the consumer.  It

17   gives them the option of getting a newly rehauled engine to put

18   into their planes immediately, without having to wait for the

19   old engine to be overhauled, to be torn down, inspected, and

20   overhauled.  They can get the planes in the air fast, and they

21   do it, as alleged by UTP, at a great price, because Pratt gives

22   a high trade-in value for the old engine.

23             And of course, that's because it then uses the engine

24   for a source as a source of parts itself, it's a competitor, to

25   continue offering these kinds of pro-competitive programs.

1          Pratt also has a fleet enhancement program, where

2   they give engine customers the option to trade in their old

3   engines for a new replacement engine at a highly competitive

4   price.  That, too, allows the aircraft operators to keep flying

5   without interruption, and it does it for a good trade in value.

6          Pratt can only provide these consumer-friendly

7   options, of course, this goes to the unilateral refusal to deal

8   allegation, if it has engine cores itself, and if it has new

9   and used parts to overhaul them.  And in fact, UTP alleges in

10  its complaint that Pratt needs refurbished engines itself to

11  provide this exchange program, paragraph 53.  And it alleges

12  that with these programs, Pratt stops selling engines to UTP.

13          This immediately distinguishes the Aspen ski case,

14  which is itself at the very outer boundaries of antitrust law.

15  In that case, the defendant failed to offer any efficiency

16  justification whatsoever for not dealing, selling a package ski

17  ticket.

18          Here, the face of the complaint itself has an

19  efficiency justification.  Pratt uses the engine for itself,

20  and a uni- and so a unilateral refusal to deal is only

21  actionable if it makes no business sense.

22          The unilateral refusal to claim here must be

23  dismissed.  And that's exactly what the court, the district

24  court in this circuit, did in the Simon and Simon case that we

25  cite, where the complaint's allegations themselves revealed

1   that there was an alternative, alternative pro-competitive, uh,

2   explanation for the refusal to deal.

3           Now UTP also claims, and this is moving down, I think

4   their slide 5, basically, the categories of conduct that they

5   say make it hard for them to get parts.  They say they don't

6   get engine cores from Pratt anymore.

7           They also claim that these two programs, the engine

8   exchange programs, are anti-competitive themselves.  That, too,

9   must be dismissed.

10          UTP's complaint is actually like a used car dealer

11  complaining that the new Toyota dealership is providing too

12  high of a trade-in value for old cars.  That might hurt the

13  used car dealer, but it helps the consumer.  That's

14  competition.

15          And if the engine owners don't want to use this

16  program, they don't have to.  They've not adequately pled that

17  the engine programs are anti-competitive.  There are no

18  plausible allegations that Pratt is somehow using these cores

19  for scrap metal or just to take them out of the marketplace

20  altogether.

21          UTP, I think, is going to say, in its slides that

22  somehow Pratt is hoarding these cores.  Pratt isn't hoarding

23  these cores.  There's no catch and kill out there.  It's not

24  like buying somebody's factory to just shut it down or throwing

25  sand in your competitor's gears.  Pratt is using these cores to

1  compete and to provide great options to its customers.  They're

2  competing for these cores, and that's what antitrust law

3  encourages.

4       Now, in its slides, slide 5, UTP's slides, citing

5  paragraphs 53 to 55, they say that Pratt coerced customers not

6  to resell their engines.  That's about these engine exchange

7  programs.  There are no plausible allegations of coercion.

8  Customers sell to Pratt because they get a good value from

9  their trade-ins.  Competing on price is encouraged.

10      They've also failed to allege that these indi- that

11  these engine exchange programs have substantially foreclosed

12  the relevant market.  Again, the market for these engines, all

13  of them out there, is huge.  That's the relevant market in

14  which they need to show substantial foreclosure.

15      UTP pleads that the engine owners, the aircraft

16  manufacturers, do sell them to buyers other than Pratt.  They

17  can sell them to UTP.  This case is actually similar, I think,

18  to the Insignia News Corp. case that they have on their slide

19  22.  There the court dismissed a complaint where plaintiffs

20  actually alleged exclusive deals with 35,000 retail shops.

21  Now, that might've sounded like a lot, but the court said

22  that's insufficient to show foreclosure without anything about

23  the size of the market, the number of engines out there.  Here,

24  UTP has failed to plead what percentage of the tens of

25  thousands of engines it can no longer get, or it's foreclosed

1   from acquiring because of these programs, even directionally.

2          With respect to the engine exchange program,

3   paragraph 53 of their complaint, they never plead what

4   percentage of the used engine market Pratt supposedly

5   forecloses.  And the same with the fleet enhancement program,

6   they don't plead the percentage of the market.  So, their

7   claims related to these engine exchange programs must also be

8   dismissed because they're not anti-competitive, they don't

9   plead it, and they don't foreclose competition in any event.

10         The same goes for UTP's allegations regarding Pratt's

11  contracts with the DOFs and supplemental type certificate

12  companies.  They don't- and this is just more of their conduct

13  here on slide 5, trying to unpack it and moving to the next

14  part in a second- they don't allege how many engine cores are

15  affected by this conduct, or what percentage of the market to

16  purchase the cores, all these engines out there, are affected

17  by these alleged restrictions.  So that must be dismissed for

18  this reason alone.

19         And again, if the source of alleged harm is pro-

20  competitive, it doesn't count for anti-trust injury.  That's

21  not injury to competition, it's competition on the merits.

22         Another way that UTP claims it's having trouble

23  getting parts is by these alleged agreements between Pratt and

24  its two authorized distributors, the DOFs, that they say, uh,

25  limit their ability, the DOFs ability, to perform bagging and

1    tagging services for UTP.  In other words, to sell the parts,

2    right- give the parts to UTP so UTP can sell it back to them.

3           Well, these allegations of de facto exclusive dealing

4    must be also dismissed for two reasons on the face of the

5    complaint alone.  First, and I won't repeat it, there's no harm

6    to competition.  Even if it's true that they can't get DOFs to

7    do the bagging and tagging work, they could do it, they could

8    go to others to do it.  But even if they- they are just totally

9    cut out of the market, the ultimate consumer is not harmed.

10   They have the same number of places to get their parts, and

11   their engines repaired, and they still have the parts in the

12   market because the DOFs break down the parts and of course use

13   them for them- itself when they are repairing the engines.  UTP

14   doesn't do the repairs.  Much different than the Kodak case

15   where there were independent service organizations.

16          UTP also fails to allege, uh- that the restrictions

17   on the bagging and tagging foreclosed the relevant market in

18   this case.  In slide 18 is paragraph 104 from their complaint,

19   and that's the paragraph where they define the relevant market.

20   The alleged markets of this case are the entire market for new

21   and used parts for these engines.  That's the market in which

22   we should look to determine if there's substantial foreclosure.

23          Again, there are plenty of ways that UTP can get

24   parts without having to rely on the resources of the DOFs to do

25   the work for it.

1          And so, if you go to UTP's slide four, which I think

2    they're going to go to, uh, when they show, Your Honor, all the

3    conduct on that slide fails. It's not anti-competitive.  It

4    doesn't foreclose competition, and there's no injury to

5    consumers.  I've gone through all the conduct there, and they

6    fail to plead a claim.

7          They also, next bucket, two large categories.  They

8    also fail to plead that UTP was foreclosed from selling parts

9    in the market for the sale of used parts, this is their next

10   category.  They say they can't get parts, and they say they

11   can't sell parts.

12          Now, what is one of the main reasons they say they

13   can't sell parts?  It's the capped cost program.  That's

14   paragraphs 93 to 98 of their complaint.  They complain about

15   pricing programs that plat- Pratt has implemented to provide

16   discounts on parts.  Pursuant to the capped cost program, if

17   the customer chooses to do a traditional overhaul instead of

18   one of the fleet exchange programs, Pratt gives customers the

19   option to buy a full package, new and used parts for a

20   particular engine in the discount of a capped cost program,

21   that gives some predictability for the customer.

22          They don't know how many parts they're going to need.

23   They can have a capped cost program.  They don't have to take

24   it.  They can buy all the parts individually, as many used

25   parts and new parts as they want individually.

1          Pratt's customers benefit, though, when they buy

2    parts for an engine under the capped cost program, because they

3    pay lower prices than they otherwise would.

4          Bundled discounts, UTP complains that this is

5    bundling, that this is a bundled discount, and that somehow

6    it's predatory, below cost.  Well, bundle discounts only

7    violate the antitrust laws when they foreclose competition, and

8    that's what the Asai[phonetic] can never pronounce that, Esai

9    or Asai case says on slide 19.  That was a case involving

10   similar allegations of bundling, and what the court said was

11   that without evidence of substantial foreclosure or anti-

12   competitive effects, they've failed to demonstrate the probable

13   effect.  And the allegations of bundling must be dismissed.

14         Here, UTP has not pleaded that the capped cost

15   program forecloses a substantial share, as they must, of the

16   relevant market.  They don't allege how many customers have

17   availed themselves of the program.  They don't allege what

18   percentage of the overhauls market goes into the capped cost

19   program.  They don't even allege that they've actually lost any

20   sales of parts to customers because of this price discounting

21   that Pratt engages in.  Any claims based on this pricing

22   program fail for this reason alone, that lack of substantial

23   foreclosure.

24         Now they also, though, don't fit established bundling

25   law.  So this is another reason they fail.

1          UTP doesn't allege that Pratt requires a customer to

2    buy one part as a condition to getting another part as an

3    initial matter.  There's no forced sale.  If the customer

4    doesn't want the capped cost program, it doesn't need to take

5    it.  Lack of a tying agreement immediately distinguishes the

6    Kodak case, that they have in their slides, which UTP now

7    heavily relies on.

8          There, Kodak sold parts only to buyers of Kodak

9    equipment who used Kodak service and repair for their own

10   machines.

11         There's also, I'm- I'm- I'm, I think they may not be

12   saying that we have a tie-in agreement.  I think they're going

13   to say, well, this is a de facto tie because of the pricing.

14   But they fail there too.  There's no forced bundle or de facto

15   tie-in because of the pricing.

16         UTP does not allege that the customer must opt into

17   the capped cost for every engine.  And this is important, the

18   customer can take it, these big fleets, on an engine-by-engine

19   basis.  If they want the capped cost program for one engine,

20   they can do that.  And if they don't want it because the other

21   engine doesn't need the same number of substantial repairs, or

22   for whatever reason, they don't need the capped cost program.

23         The customer can choose it on a repair-by-repair

24   basis, where it will get the best price.  And of course, UTP

25   can still compete on an engine-by-engine basis.  By buying

1    parts from UTP on one engine, customers don't endanger

2    discounts on other engines.

3           Now, in both the ZF Meritor and the Pages case, the

4    customers had to meet purchasing requirements or targets across

5    all purchases to get a discount.  So, for instance, the ZF

6    Meritor case involved conditional market share discounts that

7    were embedded in long-term contracts.

8           If the customer didn't meet the market penetration

9    requirements, the alleged monopolist could entirely cut off the

10   supply of critical products.  That's the way the CF Meritor

11   case worked.  And worse, in that case, if the customer didn't

12   comply with the targets, they actually had to repay Eaton, the

13   monopolist.  There are no such allegations here.  That is not

14   this case.

15          Now, so, they don't qualify under established

16   bundling law.  And even if they did, these capped cost programs

17   do not foreclose a substantial share of the actual relevant

18   market, the competition for parts.  They don't say how much.

19   They don't allege it.  Two independent reasons that these

20   allegations fail.

21          Pratt's parts discounts may disadvantage UTP, to be

22   clear, by offering customers lower prices.  But that's the kind

23   of stuff that the antitrust law encourages.  It's not a

24   violation.

25          UTP also alleges that Pratt coerced and imposed

 1   restrictions on DOFs from purchasing from independent

 2   suppliers.  But if you look at paragraph 83 of their complaint,

 3   which is what they cite, they provide no factual support for

 4   the allegation that Pratt coerced DOFs.  They just say that on

 5   information and belief, it may take the form of threats.

 6          And they allege, so that's too conclusory, and they

 7   allege that Pratt amended its DOF agreements to ban DOFs from

 8   selling used, serviceable material over the counter.  But

 9   nowhere do they allege that they can't sell directly to

10   independent MROs or the aircraft manufacturers, again

11   themselves.

12          At bottom, UTP is upset because Pratt and its branded

13   shops, I guess won't sell its stuff according to their

14   allegations, taking them as true.  That's just like the used

15   car dealer claiming that it should be able to sell its cars

16   through the brand name dealership, or saying that they should

17   get to use the Toyota lot to sell their cars.

18          UTP is not Pratt branded.  It's not a Pratt

19   authorized dealer, and it doesn't do the repairs.

20          Finally, I want to say a thing, because I suspect, as

21   they do in their briefing, that UTP is going to get up here and

22   rely heavily on a monopoly broth sort of theory, which is where

23   they say they can amalgamate, they can combine all the conduct

24   and somehow show injury or meet the standard.

25          I want to say a few words about that theory, because

1  that doesn't save their claim here.  In their brief at eight,

2  they say, page eight, they say the court should focus not on

3  each component, but rather on the overall course of conduct and

4  the impact.  But as we've talked about, the allegations here,

5  as a whole, do not show anti-competitive conduct on the market

6  as a whole.  They just simply do not.  They show Pratt

7  competing with lower prices and with more options for

8  consumers.

9         Even setting aside the fact that their allegations as

10 a whole, but if you added them all up, don't show harm to

11 competition, zero plus zero does not equal one.  This is not a

12 case like the ones UTP cites of cumulative foreclosure, where

13 they have pleaded several actionable pieces of conduct that

14 just simply do not individually foreclose the market, but do

15 collectively.

16        This is not like the Continental Ore case that they

17 cite, where there was a clear price fixing conspiracy going on

18 for years, almost a decade, and the court says you don't wipe

19 it clean after everything.  There was a clear- there were clear

20 violations there.  Or the recent NTE versus Duke case out of

21 the Fourth Circuit, where there was a regulated utility with a

22 statutory duty to deal, and they terminated an interconnection

23 agreement based on false pretenses.

24        They told the- the- the- the- the plaintiff there,

25 don't send an invoice.  We'll bill you.  And then the plaintiff

1    didn't send the invoice that they said, yippee, we get to

2    terminate you.

3            There was an actionable unilateral refusal to deal in

4    that case, not here, and it was combined with other

5    exclusionary conduct and actual higher prices to some

6    consumers, some other customers in the market.  It was a

7    regulated utility case that they were cross-subsidizing.

8            That is not this case.  This is a case- this is not a

9    case where existing doctrines don't fit.  In fact, this case,

10   if Your Honor, goes to slide 20, I'm almost done with my

11   slides, um, this case is actually more like the Supreme Court's

12   Link Line case.  And in that case, the court found that there

13   was no actionable conduct, there was no refusal to deal claim,

14   like here, and there was no predatory pricing claim, like here.

15           And so, the court says you can't combine those two

16   claims to make a wrong.  You can't do it.  Two wrong claims do

17   not make one right claim, and that's what UTP is trying to do

18   with their scatter shot allegations in a long complaint.  They

19   have a lot in there, but if you actually look at them, you- and

20   study them, and that's what I've tried to do, you see how they

21   fail in what they do not allege.  They're actually pro-

22   competitive.

23           Here, their allegations, collectively, even

24   collectively, do not show harm to competition.  They have

25   nothing more than a nonactionable refusal to deal claim over

1  Pratt's own engine sales, where Pratt decided not to sell to a

2  competitor.  That's perfectly legal, Novell, Simon and Simon, a

3  bunch of other cases, they have nonactionable unilateral

4  conduct.

5         I didn't get into this for Pratt's pricing of its

6  manuals.  Somehow, they say they price- Pratt's manuals too

7  high.  That's not an antitrust violation.  No doctrine that

8  says that.  They have nonactionable allegations of lower prices

9  through deals that the customers can voluntarily take or leave

10 without impacting any other engine options from Pratt or Pratt

11 sale of any used or new parts.  They'll sell to all their

12 customers no matter what.

13        And they have nonactionable allegations of

14 agreements, uh, with the DOFs that don't actually foreclose UTP

15 from the relevant market or harm the actual consumers for

16 repair services.  The monopoly broth talisman cannot be invoked

17 to overcome these pleading deficiencies.

18        Now I thank Your Honor, because you allowed me to

19 speak for a long time, I had a lot to say.  I'm happy to answer

20 any questions or- or answer them later.

21        THE COURT:  Let's see what the counsel has to say,

22 then we'll circle back.

23        MS. GIULIANELLI:  Thank you.

24        MR. ROBERT MILNE:  Yep, uh, Your Honor, Rob- Robert

25 Milne.  May I come to the podium-

1          THE COURT:  Please, absolutely, wherever you are most

2  comfortable.

3          MR. MILNE:  Well, Your Honor, Robert Milne again, uh,

4  thank you for taking all the time with us here today.

5          THE COURT:  Absolutely.

6          MR. MILNE:  I don't know if this microphone is

7  working.  Uh, what I- and I want to use the time most usefully

8  for you if you have specific questions, just listening to what

9  we heard, I'm happy to answer those.  But what I would like to

10  do is first pull the camera back.

11          What I just listened to here sounded to me like a

12  summary judgment motion.  It sounded to me like what Pratt is

13  doing here is trying to take factual allegations across our

14  very detailed complaint and contest them in various, various

15  ways.

16          Uh, I will spend time walking through why we think

17  they're incorrect, why the allegations in our complaint are

18  100%, uh, aligned with, uh, the requirements of the causes of

19  actions, uh, that- that we assert here.  But, uh, I think we

20  all know, uh, that this is not the proper stage, uh, to be

21  contesting facts the way that we just heard happen here.

22          The other thing that I'll just say at the outset is

23  that, uh, ev- even though they say they're not doing it, they

24  did the very thing that the Continental Ore case and the

25  various other cases that we cite in our brief, which they

1  disparagingly talk about as monopoly broth.

2        Uh, but what they do is they take apart pieces of the

3  overall set of conduct that Pratt undertook to eliminate this

4  form of competition that had existed in the marketplace for 30

5  years before 2015, 2016, when Pratt decided that it wanted to

6  take over, uh, the used, uh, service material, the used parts

7  and engines marketplace.

8        Uh, they want to take, uh, apart the individual

9  pieces and argue and make it sound like, uh, we are asserting a

10  bundling claim, or we're asserting a unilateral refusal to deal

11  claim, and there's a body of law around each of those.  And to

12  be honest, if we really had a full factual record, I think we

13  are going to be able to establish the elements of these various

14  claims.  And I'll talk about some of them as we go.

15        But what you don't do, and we don't have a count in

16  our complaint that says, uh, you know, this bundling program is

17  itself an independent antitrust violation.  We don't have that.

18  And there's a reason for that, because what we're doing here,

19  Your Honor, is challenging an overarching arrangement.

20        What we claim in the complaint is what I would call a

21  classic, uh, Kodak-style aftermarket monopolization case.  Uh,

22  that is, that is- and now there are many aspects to what the-

23  the actions that Pratt undertook to- to be able to accomplish

24  that after market, uh, monopolization.  But that's what we're

25  challenging here.  We're not bringing a bundling ga- claim

1    against the capped cost program as a stand-alone thing.  It's

2    the totality, right?  That's what we allege in the complaint.

3            They say we don't make claims relating to harm to

4    competition.  Well, the reality, Your Honor, is that in our

5    complaint, we speak of the foreclosure that has occurred in

6    this marketplace, uh, since Pratt undertook its conduct.

7            You didn't hear there- the two types of engines at

8    issue here.  Uh, the PW100 and the PT6.  Very carefully, they

9    spoke about PT6, uh, uh, more, and you didn't really hear much

10   about PW100.  And part of that is because on the PW100 side,

11   uh, there is 100%, uh, foreclosure at this point.  Uh, that is

12   what we're claiming in the complaint as a factual matter.

13           We are claiming comparable, but not 100% foreclosure

14   on the, uh, PT6, but the, the- and one other thing that I just

15   want to not forget to say is they spent a lot of time, uh, dis-

16   I don't- I won't say disparaging, but, uh, describing, uh,

17   independent used service material providers like Universal

18   Turbines, and we're not the only one in that space, and we have

19   our slides here, Your Honor.

20           And maybe I just, uh, reference you to slide, uh,

21   two, the first substantive slide in our materials.  And that's

22   just the kind of overview, this is from our complaint, the

23   picture of the, uh, various players here.  And, uh, where UTP

24   sits is in the upper right there, the used serviceable

25   material, uh, provider.

1          Again, it's not the only one.  There are several, uh,

2     and there have been many over time, and, uh, several have been

3     driven out and, uh, and, and to be honest, uh, UTP has already

4     been driven out of the, uh, PW100 space.

5          Uh, the idea that we have parts and we can sell, and

6     we can do those things.  We allege 100% foreclosure in our

7     complaint, and again, I feel like I'm arguing a summary

8     judgment motion, because we, we will, when the case progresses

9     and we get into discovery, demonstrate all of those things.

10         But that's one thing we do know, is that, uh, we have

11    experienced that, that type of foreclosure.  And the role that,

12    uh, that players like UTP and these independent used service,

13    uh, part providers, uh, have played in the market is a pro-

14    competitive one.  They were in business for decades before this

15    scheme got underway.

16         They played a role in this marketplace, and we can

17    fight later over the facts of the role that, uh, independent

18    USM, uh, providers played, but they stayed in business.  And

19    how they stayed in business was by identifying parts in the

20    marketplace.

21         And they had sources, Pratt, the DOFs, independent

22    service providers, owners as well, uh, of the, of the aircraft

23    themselves, and they would procure these parts.  And they, you

24    know, to the extent they are able to today, still do that.

25         They are able to get them when there are shortages.

1    They can get them to, uh, uh, to clients faster.  They, uh,

2    they can refurbish material.  They can do things to, uh, they,

3    they perform an economic role.  If they didn't, the rhetorical

4    question is, how would they have stayed in business for as long

5    as they did?

6            Now, Pratt made a decision that it didn't like this

7    competition.  Pratt, our theory, and the allegations that we're

8    making here are that Pratt like, like in these classic

9    aftermarket, uh, foreclosure cases, for a while, Pratt

10    tolerated competition downstream in the used services market.

11            Pratt would prefer to sell a bigger mix of, uh, new

12    parts compared to old parts.  Um, it can make higher margins.

13    It may not be best, ultimately, for the ultimate customers

14    here, but, uh, that is its interest.  Having this vibrant

15    source of independent competition out there was something that

16    Pratt apparently made the decision it did not like.

17            Now, uh, slide 3 in our material is a quote from an

18    industry news source.  It's on, on the internet from back in

19    2016, and it was around 2015, 2016 that we began to see some of

20    this, uh, conduct occurring.  And it was reported in the trade

21    press that Pratt had indicated to the market that it wanted to

22    exert control over the spare engine aftermarket, uh, which, uh,

23    the reporter indicated has not gone down well, uh, with some

24    airlines.  These are the ultimate operators who want choice.

25            That's, that's- now, we can fight over that later,

1    but that's the essence of the allegation here.  They say

2    there's no injury, nobody cares.  We're just brokers.  The, the

3    reality of our claim is, is, right in line with the kind of

4    theory at issue in the Kodak case.

5            And there's a, a quote from Kodak, Your Honor, that I

6    definitely don't want to forget to mention to you, which goes

7    to this issue of harm.  Uh, and in Kodak, the court says, and

8    this is at, uh, 483, of the opinion.

9            This is, quote, the alleged conduct, higher service

10   prices, and market foreclosure.  Now we allege a price impact,

11   Your Honor, in our complaint.  We don't have chapter and verse.

12   We haven't taken discovery yet, but our perception is that as a

13   result of this conduct, prices have gone up for used

14   serviceable material, the overall mix of replacement parts.

15           And what the court says in Kodak is the alleged

16   conduct, higher service prices and market foreclosure, uh, is

17   facially anti-competitive, and exactly the harm that the

18   antitrust laws aim to prevent, and Third Circuit authority is

19   very much aligned.

20           Each- these, these cases that are, uh, uh brought

21   under section two and certainly section one as well, are very

22   fact-specific.

23           But there is a theme that you can see running through

24   the Third Circuit authority, very in line with what, uh, what

25   Kodak talks about, and that is that when a monopolist- and one

1    other thing that we allege in the complaint that is, uh, makes

2    our claim even stronger than what was at issue in Kodak, is

3    that in Kodak, uh, they were not able to allege, uh, or the

4    facts were not that Kodak was dominant in the upstream market

5    for the, for the photocopy machines, the big, old fashioned,

6    giant copy machines.  There were others, Xerox, Canon, you

7    know, companies like that.  So, they had a significant market

8    share, but not a dominant market share.

9            We assert that Pratt does have a dominant market

10    share in the upstream market for these types of engines, and

11    then they dominate the aftermarkets as well.  And then they,

12    pursuant to this strategy, have taken steps to curtail

13    competition in the aftermarkets.

14            And the theme that we see running through the Third

15    Circuit authority is that when a monopolist, when somebody who

16    has substantial market power, and it doesn't need to be a

17    complete monopoly, it doesn't need to be 99%, uh, but what,

18    what the Third Circuit talks about, uh, for example, in

19    Dentsply, uh, flagging that it is a problem when a monopolist,

20    uh, undertakes downstream exclusions, and this is a quote, "to

21    impair choice in the marketplace."

22            Um, in LePages, uh, there was a bundle, uh, bundling

23    program, but the, uh, but what the court talked about was

24    locking up distribution channels, high-volume distribution

25    channels, to the detriment of competition to, to reduce choice.

1          Quintessentially, that's what's happening here.

2    That's what we're claiming.  We're only at 12(b)(6), uh, we

3    will prove these things.  But, uh, that is, uh, that is the

4    essence of our claim.

5          Now we have slides here, uh, that describe the

6    categories of activity that Pratt undertook.  We try to, you

7    know, provide somewhat of a road map to the complaint.  So

8    slide four, uh, goes through, uh, various of the steps that we

9    perceive that Pratt undertook to make it hard for us to get the

10   raw material, uh, to get the engines, to get the parts, um,

11   and, uh, counsel, uh, very, uh, thoroughly walked through the

12   various buckets and contested them and took issue with them.

13   We can fight about that later.  We disagree.  And I won't take,

14   I know where, I'm conscious of time, I won't, I won't go

15   through every bit of chapter and verse on that.  But we

16   disagree with this, that what, what Pratt did, whether any

17   individual action, there's like a famous line in the Microsoft,

18   uh, DC Circuit opinion, uh, after the big Microsoft case, that

19   you can have a lawful conduct, uh, uh, but and, and looking at

20   it in isolation may be lawful, kind of like it's lawful to own

21   a baseball bat, but that doesn't make you, uh, immune from an

22   assault charge, depending how you use the baseball bat.

23          And, and so the individual things that we allege

24   here, uh, are- include, uh, that suddenly, after years of

25   dealing directly with independent use- USM suppliers, Pratt,

1    stopped dealing with us.  Uh, DOFs stopped dealing with us to

2    be able to get this, uh, this, if you will, raw material input

3    for, uh, the spare parts.

4           Uh, and when we would ask, our people would ask, why,

5    because Pratt has discouraged us, told us, required us not to

6    do that, um, and the various other steps, uh, uh, uh, down the

7    line to prevent, and they mentioned that we could procure

8    engine parts from owners-operators.  Theoretically, we can, but

9    one of the things Pratt did as part of this overall thing was

10   put in place these trade-in programs, uh, that stacked the deck

11   in a way that made it- that said, you want to buy a new engine,

12   uh, you get, uh, a certain price, but you have to give us back

13   the old engine to take that material out of the marketplace.

14          THE COURT:  But isn't that just incentivizing the

15   consumer?

16          MR. MILNE:  It is incentivizing the consumer.  But

17   when you take it as part of the overall picture, we're- I'm not

18   sitting here today, at least subject to discovery, telling you

19   that that program, that we were bringing a lawsuit on that

20   program alone.

21          It's when you pull- it's like the baseball bat

22   analogy.  You pull the camera back, and you look at the

23   totality of the picture, and you see what's happening, um, and,

24   and you see it on, on the cell slide as well, where Pratt took

25   steps and, and, this is slide five, is just taking the

1    categories of conduct in slide four and breaking it down to the

2    various sources and, and doing the cross referencing. So, you,

3    you can see that.

4         Um, slide six speaks about the various things that

5    Pratt did in curtailing the ability of, uh, UTP and other

6    independent, uh, providers to be able to provide their parts

7    downstream.  Uh, and, and, they and, you know, it's, it's

8    clearly a pattern.

9         This, this conduct didn't happen before, right?  It

10   started happening now, counsel-

11        THE COURT:  When you say before, because I think the

12   timeline is important.

13        MR. MILNE:  Yeah.

14        THE COURT:  So, what timeline are you talking about?

15        MR. MILNE:  Before that 2015, 2016 timeline, before

16   that rough timeline.  And again, we're the plaintiff.  We

17   haven't seen everything on the inside of Pratt, so we can only

18   speak to what we see in the marketplace and in and around that

19   time frame, that's when we started seeing the squeeze, if you

20   will, where different players in all different parts of the

21   ecosystem, if you will, um, uh, either stop dealing or made it

22   harder for us to, you know, deal downstream.

23        Uh, so, so, that what, what you end up with, though,

24   and in, in, frankly, this scheme is more comprehensive then I,

25   I would submit this scheme is more comprehensive than what was

1    at issue in Kodak or any of the other monopolization cases,

2    because, because they boxed us in on both sides, on the

3    procurement side, and then on the downstream side, to be able

4    to actually, you know, sell our material, uh, downstream.

5              So, the, the combination of the two was, was and is,

6    uh, very effective has, has been very effective in the

7    marketplace.  And slide seven is just a visual overview of when

8    you look at the chart that showed, uh, the state of affairs

9    before 2015, '16, and before we saw that trade press article

10   indicating Pratt's intentions, uh, what we see are these red

11   X's.

12             Uh, and, and what they do is block off or

13   significantly curtail, uh, this whole segment of the

14   marketplace.  And it's not just UTP, of course, uh, this

15   segment of the marketplace from being able to operate in the

16   space that it had operated for decades, providing services

17   that, uh, clients obviously liked, and that trade article

18   indicates that they did like that service.  They didn't want to

19   have, uh, that taken away.

20             And again, we'll get into this in discovery, but that

21   is, uh, that, that is the essence of our claim.  And I could

22   walk through, recite the cases in, in our brief.  Uh, there are

23   any number of, uh, if you, if you walk through the Kodak case,

24   uh, oh, one other, one other thing on this whole issue of

25   disaggregating, uh, the zero plus zero can never equal one.

1        We, we believe that we have adequately alleged, uh,

2   this core Kodak aftermarket exclusion.  That is an antitrust

3   violation under established Supreme Court precedent.  Uh, we

4   also believe that some of the individual conduct, depending on

5   the facts as we discover them, may themselves also amount to

6   antitrust violations.  And we believe that the imposition of

7   restrictions on the DOFs, when you take it as part of this

8   overall scheme, does two things.

9        First, it takes this case out of the Aspen Skiing

10  case, the counsel referenced, right, Aspen Skiing was a pure

11  unilateral case.  In other words, the- in that case, it was ski

12  lift, a ski operator in Aspen, that controlled three out of the

13  four ski areas, and made it hard for the fourth area to be able

14  to compete effectively, where it had dealt with that entity for

15  years before.

16        And one of the things the Supreme Court identified is

17  if there's a prior course of dealing, um, that was profitable,

18  and now it suddenly gets taken away, um, you know, that, that

19  at least, and many of these cases, Your Honor, are cases that

20  are being decided on a full factual record. You know-

21        THE COURT:  I think counsel would, the crux of what

22  you're saying is, Judge, it's a 12- we're at 12(b)(6).

23        MR. MILNE:  (Laughter) You should not grant 12(b)(6)

24  here, um, given the factual, uh, what the factual issues that

25  we are we are confronting here, but I'm pointing out Aspen only

1    because that exception, uh, that- that I mentioned is an

2    important one, and we believe there was a prior course of

3    profitable dealing that Pratt undertook, and even as a stand-

4    alone monopolization theory, um, we would have good arguments.

5            But here, there's more, because they also put

6    restrictions on the DOFs, and so that takes it out of just the

7    straight-out, uh, uh, if you will, pure monopolization theory

8    that you see in Aspen.  And it brings it into, um, you know,

9    now you're doing things beyond just making a purely unilateral

10   choice, economic freedom.  You're doing more to manipulate this

11   downstream space.

12           Counsel spent a lot of time on per se versus rule of

13   reason, and because now we're getting into the agreements, I

14   think it, you know, it makes sense to speak about that to some,

15   to whatever extent Your Honor wishes.  But what I would say is,

16   first of all, and I think counsel even conceded this, that

17   there is a competitive- there is no question that, uh, Pratt

18   competes against DOFs downstream.  It's like any, you know, if

19   you will, sort of dual distribution situation where a

20   manufacturer is working through middlemen in, in some respects

21   of its business, but also dealing directly with customers that

22   could go to the middleman if, if, uh, if they wish.

23           So in that respect, they are, they are competitors.

24   And the Supreme Court in Kodak recognized that there was a

25   horizontal relationship between Kodak and the independent

1   service providers there, as a, as an economic reality.  Um, and

2   so while there is verticality, if you will, there is this

3   horizontal piece.

4          And, and in that sense, uh, and whether they say we

5   want to have a hub and spoke conspiracy here, uh, to be able to

6   think about this as per se.  I- the label is really less

7   important now to the economic substance.

8          There is no question that I don't think there's any

9   serious dispute that Pratt competes against the DOFs.  We are

10  not talking about hundreds of distributors, like in the

11  Dentsply case or some of these cases where, uh, you've got one,

12  if you will, monopolist upstream, signing distribution

13  agreements with hundreds of others.  We've got 2 or 3 or a

14  handful of DOFs.

15         Uh, they have- they are competing.  So there's a

16  horizontal aspect to that relationship.  We understand there

17  are agreements there.  Um, they mention that we make some

18  allegations on information and belief, and we do that in good

19  faith, recognizing our obligations as officers of the court.

20  We don't have the direct evidence.  We haven't taken discovery

21  to show that the DOFs, how much the DOFs knew.

22         But under the circumstances here and the case law, I

23  think is, makes this clear that, uh, there, there are obvious,

24  uh, applying economic common sense, if you will, incentives for

25  the DOFs to not have to deal with, uh, independent competition

1   for their downstream business.

2          And so, if Pratt comes to them and says, we'd like

3   you, and against a backdrop of news articles like that one from

4   2016, and says, hey, we'd like you to stop selling to, uh,

5   independents.  Uh, there is an arguable incentive that they

6   have to agree with that.  Why?  Because they don't benefit.

7   They benefit from less competition.

8          And, again, these are- so cases, uh, uh, you know,

9   we- there are, uh, let's see.  Uh, sorry, Your Honor.  Um, the

10  Caterpillar case, the Deer case that we cite in our papers, are

11  both cases that discuss, uh, that, that discuss the, uh,

12  independent incentives that middlemen may have to, uh, if you

13  will, enter into a conspiracy to boycott competitors.

14         And, uh, the cases, uh, that, that we cite, including

15  the Clores case, including, uh, uh, Caterpillar, Deer and, and

16  others, uh, yeah, let me just make sure I get the full, yeah,

17  Deer, Caterpillar, Deer, uh Clores, are good examples of cases

18  where, despite there being, uh, multiple levels involved in the

19  alleged conspiracy, the courts at least held open and in Clores

20  found that there- that, that this agreement will be treated

21  under the per se rule, uh, as a boycott, as clearly reducing

22  competition.

23         But the- but one thing that the Caterpillar case, I

24  think very rightly, in the high fructose corn syrup case, which

25  is referenced in the Caterpillar case, Your Honor, does say, is

```
 1    that you don't need to and in some way shouldn't decide the per
 2    se issue at this stage at the 12 B6 stage. And that's because
 3    the, uh, here we have Rule of Reason claims already.
 4            We think they should go forward.  Uh, we think
 5    they've been adequately pled.  So the, uh, discovery issues
 6    around relevant market, the- all- that those broader issues
 7    that sometimes in a, in a, in a per se case where if the only
 8    claims are, uh, claims that either should- could go either way,
 9    per se or rule of reason, there may be a reason to think about
10    it sooner because it affects the scope of discovery.
11            Here, that's not the case because we've got section
12    two claims, and they will necessarily, um, you know, will
13    involve the, you know, sort of broader market inquiry and the,
14    uh, the competitive impact.
15            Um, Your Honor, I know we've been running a long
16    time, and I have way more I could, I could say.  I'm happy to,
17    uh, maybe pause and see if-
18            THE COURT:  Why don't we take a brief recess-
19            MR. MILNE:  Sure.
20            THE COURT:  -and then that'll give me a moment to see
21    if I have any additional follow-up questions from either of
22    you.
23            MR. MILNE:  Okay.
24            THE COURT:  And if you want to add anything else
25    before we conclude, I'd be more than willing to let you do
```

1   that.

2           MR. MILNE:  Thank you, Your Honor.

3           THE COURT:  Thank you.  Stay in here, brief recess.

4           BAILIFF:  All rise.

5               (Recess at 12:00 p.m., until 12:16 p.m.)

6           MR. MILNE:  Well, I certainly have a point or two I'd

7   like to make, Your Honor.

8           THE COURT:  Okay.  Why don't I allow him to do that?

9   So that you can give one concise rebuttal?

10          MR. MILNE:  Thank you, Your Honor.  Thank you again

11  for taking so much time with us.

12          THE COURT:  Absolutely.

13          MR. MILNE:  I just in, in kind of closing here, uh,

14  wanted to reiterate, uh, that we are claiming, you know, you

15  pull a camera back, we are claiming this aftermarket

16  foreclosure case, uh, uh, and that when you, uh, one of the

17  things that we heard from, uh, Pratt's counsel is that, don't

18  worry about anything in this complaint.  There are plenty of

19  options still out there.

20          Uh, I- that is something we can fight about.  That

21  runs 180 degrees contrary to the allegations in this complaint

22  where, for the PW100, we claim that this conduct led to 100%

23  foreclosure.

24          We do not understand that there is any independent

25  service or overhaul facility providing that type of service for

1    a PW100 engine.  None.  That is our, that is our understanding

2    on information and belief and what we understand in the

3    marketplace.

4         They may disagree with it, but that's for, that's for

5    another day.  And uh, they also said that we don't make any

6    allegation in, in the complaint about an independent service or

7    overhaul facility being eliminated from the market as a result

8    of this conduct.  Well, paragraph 75 identifies at least one,

9    the entity called RBC.

10        And I think what this does is just underscore how

11   what is happening here is that Pratt is trying to take a

12   12(b)(6) motion and turn it into a summary judgment motion.

13   And there were a lot of facts thrown around in the in the

14   presentation that you heard from Pratt.

15        I, we disagree with plenty of what was said, but we

16   clearly don't have time to go through all of that.  What I

17   would say, though, in, uh, in closing, is that if you look at

18   the situation in the Kodak line of cases and the, uh, the

19   leading cases in the, in the Third Circuit, even the Harrison

20   Air case that is cited in the, in the, uh, Pratt brief, uh, uh,

21   involves one of these, uh, aftermarket exclusion claims. And

22   one of the things that the- and there the court said that the,

23   uh, plaintiff had not succeeded, and the, uh, the court, the

24   Third Circuit in that case, specifically goes through several

25   of the reasons why it felt that that plaintiff had not

1    succeeded.

2            One was that there was vibrant market competition in

3    the primary markets.  That's not the case here.  One was that

4    there wasn't, uh, allegations about the, the- or proof because

5    there you were talking summary judgment and not just on the

6    pleadings.  That case had obviously made it past the pleadings

7    to get to summary judgment, but after all the discovery, the

8    court said, well, there isn't enough information about, you

9    know, the kinds of some of the factors that the, uh, Supreme

10   Court talked about in Kodak, like aftermarket foreclosure.

11           Here, we say near 100% for PW100, uh, and near 100%,

12   uh, for the, uh, for, for the PT6.  Um, the information

13   asymmetries, the difficulty in being able if you're a customer,

14   and this is one of the things the Supreme Court talks about, is

15   when you're a customer for that big-ticket equipment here, an

16   aircraft engine, in Kodak, these great big old copy machines.

17           Uh, one of the things that is that is difficult, and

18   that's why you have this idea of a lock in market, is that once

19   you make that decision, it's hard to- if you don't like the

20   diminution in competition on the service side, uh, if it, if

21   it's a big ticket item, you can't just switch out, I'm going to

22   get, you know, uh, a Honeywell engine. It doesn't work that

23   way.  Or, you know, for those big photocopy machines.

24           That's clearly our situation here, that those kinds

25   of lock-in costs, the inability to sort of figure out on the

1  front end, uh, how much it is going to cost to service the

2  engine and whether that might change over time, which is what

3  happened, we allege happened here.

4          So all of those things, it's a very long-winded way

5  of saying, Your Honor, there are, uh, we believe we've alleged

6  the elements of the claims.  Um, we can- we should get into

7  discovery if they want to move for summary judgment.  We

8  welcome that.  We are confident we'll be able to make this

9  case.

10          And at a bare minimum, Your Honor, if there, if there

11  are bits and pieces around the edges here or any aspect that

12  you believe needs a little fleshing out, uh, and we're not

13  asking for this because there has been a long stretch here, and

14  we'd like to get into discovery and move the case forward.

15          But certainly, uh, you know, we've to replete is, of

16  course, uh, something that we understand should be liberally

17  granted. And, uh, we're not asking for it here.  We think we've

18  got a good complaint.  We should get going.  Thank you, Your

19  Honor.

20          THE COURT:  Thank you.

21          MS. GIULIANELLI:  I suppose this time I'll stand at

22  the podium.  I have all my stuff here.

23          THE COURT:  Whether you- wherever you prefer.

24          MS. GIULIANELLI:  Okay.  I just have a couple of

25  brief comments in response to what counsel for UTP argued.

1          We agree that we're here, first of all, on a 12(b)(6)

2     motion, every single thing that I argued was based on an

3     allegation in their complaint, and a failure to plead the

4     required elements as a matter of law.

5          Uh, counsel is right that Kodak is a case about

6     market definition.  The court's ruling there was that

7     competition in the market for the machines did not preclude a

8     showing that Kodak had parked- market power, and we're not

9     challenging the relevant market definition or market power here

10    on a motion to dismiss.  Although we very well may at summary

11    judgment.

12         And the reason we're not challenging that is because

13    they fail to allege that there is a violation in anti-

14    competitive conduct in the first place, conduct that hurts

15    competition or consumers.

16          I think it's very telling and important what counsel

17    said.  Counsel admitted that they don't claim, at least now,

18    which they must to survive a motion to dismiss, that each

19    component, like the unilateral refusal to deal or the bundling

20    itself, is an antitrust violation.  He said that the agreements

21    may amount to an individual violation.  They're not even

22    arguing that they do.  What they're arguing is basically a

23    course of conduct case.  And they cited the Microsoft case.

24         But I actually happen to know that case well, because

25    as a baby lawyer, I was in the Justice Department and tried

1    that case.

2          Critically, there, the DC circuit reversed the

3    district court's reliance on a course of conduct monopoly broth

4    argument.  And that's at 253 F, third 34, pages 44, 43 to 44.

5          And the reason they said they reverse for course of

6    conduct liability, uh, the conclusion that Microsoft's course

7    of conduct separately violates section two of the Sherman Act.

8    And that's because the district court and the course of conduct

9    portion of the opinion didn't actually lay out any conduct that

10   harmed competition.

11          In fact, the DC circuit wrote that the course of

12   conduct section of the district court's opinion had only a

13   specific act that referred to Microsoft's expenditures in

14   promoting its browser, which the court wrote is not in and of

15   itself unlawful.

16          Now, there was a bunch of unlawful conduct there,

17   tying arrangement and a bunch of other conduct that did violate

18   the antitrust laws, unlike here.  But it wasn't a course of

19   conduct case without any unlawful conduct.

20          I want to say one thing about the per se, because

21   they really do not allege a per se claim that requires a group

22   boycott allegation.  Like Clores, counsel cited the Clores

23   case.  There was a horizontal group boycott.  To have a group

24   boycott, you need an agreement between horizontal competitors.

25   They don't allege that here.

1          Counsel referred to the fact that the Kodak case

2     recognized that there was, he called a dual distribution, and

3     in that case, a horizontal aspect.  Well, that is true.

4          We're not saying there's not a horizontal aspect here

5     between Pratt and the distributors, but there's also a vertical

6     aspect.  This is a dual distribution case.  And as the Winn-

7     Dixie case and other cases make perfectly clear, in dual

8     distribution cases, you apply the rule of reason.

9          So, in Winn-Dixie, there was an allegation that a

10    bunch of mushroom farmers were, you know, excluding, agreeing

11    to exclude competition, but they were also, uh, the, the

12    distributors, uh, the distributors were, that was a rule of

13    reasoning case.  And Kodak itself was a section two rule of

14    reason case.

15         There's no per se violation here because they just

16    have not pled a horizontal agreement whatsoever between the

17    DOFs.

18         I think that's all I have to say.

19         THE COURT:  Okay.  Thank you very much, counselor.

20         MR. MILNE:  May I just make one point in closing, we,

21    uh, just for clarity, uh, do claim that the conduct to exclude,

22    uh, uh, competition in the after markets is a stand-alone

23    antitrust violation and that there are steps taken to

24    effectuate that.

25         You also, uh, make the claim that there's several

1    aspects of what we are alleging here qualify as stand-alone

2    agreements, including the series of exclusive, uh, uh, either

3    express or de facto, exclusive agreements with the major

4    players in the distribution chain.

5            So cases like Dentsply, uh, even ZF Meritor and

6    others speak to the issues around exclusive dealing, and the

7    briefing covers that.  So I don't want it to be left unspoken

8    that we are claiming that aspects of this overall scheme, if

9    you will, um, do qualify as antitrust violations.

10           And the only other thing I want to be clear is this

11   course of conduct issue, uh, in the Suboxone case.  The EPA

12   case, uh, the court, uh, there, uh, I'm just going to read,

13   read the quote from the court's opinion says, uh, "it would be,

14   uh, an untenable proposition that just because a defendant

15   engaged in various actions or business decisions that are

16   considered in isolation, may potentially be legal, uh, the

17   antitrust laws cannot touch a defendant's attempt to use the

18   cumulative effect of these actions and decisions to constrain

19   the market and preclude competition."

20           That is what the Suboxone court says would be an

21   untenable thing to do, particularly at the very outset of the

22   case, like we are now.  And that's all I have.

23           THE COURT:  Thank you very much.

24           Thank you very much, counsel.  Have a wonderful day.

25           MR. MILNE:  You too.

1              BAILIFF:  All rise.  Court is adjourned.

2                 (Proceedings concluded at 12:29 p.m.)

<u>C E R T I F I C A T E</u>

       I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____      5/12/2025
Signature of Transcriber             Date


Oren Kwiatek
_____
Typed or Printed Name